335 So.2d 151 (1976)
GENERAL TELEPHONE COMPANY OF the SOUTHEAST
v.
ALABAMA PUBLIC SERVICE COMMISSION et al.
SC 1288.
Supreme Court of Alabama.
May 21, 1976.
Rehearing Denied July 2, 1976.
*153 Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ward W. Wueste, Jr., Durham, N. C., for appellant.
Carl L. Evans, Montgomery, for Alabama Public Service Commission.
Maurice F. Bishop, Birmingham, for the State of Alabama and Hon. George C. Wallace, as Governor.
Oliver W. Brantley, Troy, for 13 Ala. Municipalities.
MADDOX, Justice.
This is an appeal by General Telephone Company of the Southeast under the provisions of Title 48, Section 90, Code of Alabama 1940, Recomp.1958, from a decree of the Circuit Court of Montgomery County which affirmed an order of the Alabama Public Service Commission dated April 15, 1974.
General Telephone filed its petition with the Commission on September 13, 1973. It sought an increase in annual revenues from intrastate telephone service in Alabama of $2,147.649, which it claimed would enable it to earn 9.5% on the reasonable value of its property devoted to the public service in Alabama, and which would permit it "to fully perform its duties to the public and to enlarge its plants, facilities and equipment to continue to provide adequate service."
General Telephone alleged that it had provided various service improvements, including the establishment of Extended Area Service (EAS) between Andalusia and Red Level and between its Dothan exchange and Columbia, Headland, Midland City, Newton and Pinckard. Additional EAS was established between New Brockton and Enterprise and between the exchanges of Daleville, Ozark, Echo, Enterprise and Newton. The company also alleged that the changes in the type of service from toll or long distances to EAS was of benefit to its customers, but resulted in a reduction to the company in income available for return and in the rate of return for the company which was not offset by increased rates from movement of various small exchanges into larger exchange rate groups.
The company contended that as a result of service improvement programs, including elimination of multi-party service in all but eight exchanges, increases in intrastate telephone plant in-service amounted to $20,832,441 between May 31, 1971, and the period ending April 30, 1973, adjusted to the level of April 30, 1974, pursuant to the provisions of Title 48, Section 52, Code of Alabama 1940, Recomp.1958. The company also claimed that the increase in telephone plant in-service was financed in substantial part through the sale of securities, which resulted in a substantial increase in the cost of capital to it, because of the increased cost of borrowing money.
On October 11, 1973, the Commission issued its order of suspension of the proposed schedules of rates and charges to April 15, 1974, and gave notice of hearing to begin on November 12, 1973, which was subsequently changed to November 14, 1973. On November 14, petitions to intervene were filed on behalf of George C. Wallace as Governor of the State of Alabama, and on behalf of the cities and towns of Brundidge, Andalusia, River Falls, Dozier, Pinckard, Kinston, Ariton, Dothan, McKenzie, Brantley and Abbeville. On November 30, 1973, petition for intervention was filed on behalf of the City of Geneva, with a subsequent petition of intervention filed on behalf of the City of Elba on January 16, 1974. Hearings were held on November 14, 1973, and on February 19, 21, 22, March 8, 9, and 11, 1974.
*154 On February 22, 1974, the APSC issued an Order on Remand in Docket No. 16474[1] reducing General Telephone's approved rates by 30 cents per month for residential telephones or $206,158 annually. The effect of the reduction, says General Telephone, was to increase the revenue sought in the present case to $2,389,578 on an annual basis.
On April 15, 1974, the APSC issued its order making findings and conclusions as to the rate base for General Telephone, its operating income, its debt equity ratio, its cost of capital, and found a rate of return on rate base of 7.20%. The Commission then denied the proposed schedule of rates and charges, giving, in part, as its reason for the denial, the statement:
"While we are fully aware that this rate of return of 7.20 per cent is less than has been permitted in the past and is considerably less than the Company requested, nevertheless, it is a net profit and permits a return to equity as of the end of the test period of 11.05 per cent. Furthermore, under this rate of return, General Telephone will earn 2.29 times its interest coverage which will protect an `A' rating for its bonds. Utilities, being monopolies, generally speaking, are better situated in times of inflation than are many nonregulated industries, and it seems reasonable to expect the utilities to tighten their belts and use every effort to make their operations more efficient.
"Inflation is an insidious malady in the body of our society. To accept the premise that the only answer to increased cost of production is to increase prices is to accept the proposition that there is no ultimate end to the upward spiral of prices, wages, and cost of living ad infinitum.
"If inflation and the erosion of the dollar is ever to be contained, it must begin somewhere. We feel that the rate of return allowed this Company, General Telephone Company of the Southeast, will permit the Company to continue to serve the people of its area, to make a reasonable profit, and to be able to finance future expansion of its system."
On April 18, 1974, appellant filed its Notice of Appeal and appeal bond for security of costs.
Subsequently, the company filed application for supersedeas on April 29, 1974, and obtained supersedeas of the order of the Commission on May 24, 1974. Supersedeas has been continued in effect.
Each of the intervenors in the proceedings before the Commission filed motions to intervene and were allowed to intervene by order of the circuit court and each of the intervenors and the Commission filed an answer and cross-bill to bill in the nature of a bill of complaint.
In an order dated May 24, 1974, the Circuit Court of Montgomery County entered an order remanding the case to the APSC for further proceedings, and directed the Commission to make findings as to the rate base, revenues, expenses and rate of return in a manner consistent with the computations which the circuit court had expressly approved in Case No. 38653, by order dated February 1, 1974, which order was subsequently appealed by various of the intervenors in the present case, to this Court and affirmed in State of Alabama v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975). On July 3, 1974, the APSC filed a petition for Writ of Mandamus in this Court seeking to have the order of remand dated May 24, 1974, reviewed and vacated, but the matter was *155 dismissed by this Court by order dated July 15, 1974.
On July 22, 1974, the APSC issued a supplemental order and made findings in compliance with the order of the circuit court, dated May 24, 1974, with regard to appellant's rate base, expenses, revenues and rate of return. The Commission concluded:
"Applying the income available for return at April 30, 1974, of $3,874,436 to the rate base as of April 30, 1974, as hereinbefore found of $52,609,198.00 results in a rate of return on rate base at April 30, 1974, of 7.36%."
The circuit court reviewed the order and on May 6, 1975, found that it was supported by the substantial weight of the evidence, and was due to be affirmed. General Telephone appealed and "asks that the Court review the case upon the certified record, make its independent findings of fact and conclusions of law, and set aside the Order of the Commission as being confiscatory and remand to the Commission to establish just and reasonable rates and charges. . ."
General Telephone argues two basic issues: (1) the evidence was insufficient to sustain the finding by the APSC that a 7.36% rate of return was reasonable and (2) the rate of return is not equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties and is so low as to result in the confiscation of its property. In short, the primary issue argued by General Telephone is that the rate of return allowed by the APSC is confiscatory.
In determining what is a fair return in order to avoid confiscation, a number of controlling legal principles are used. These principles are set out in detail in Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., 253 Ala. 1, 42 So.2d 655 (1949). We consider it unnecessary to set out all of the legal principles noted by the Court in the Southern Bell case, but the plain holding of that case is that the law of this state not only requires that the utility be permitted to charge just and reasonable rates which will enable it to earn a fair net return on the reasonable value of its properties, but it take cognizance of the fact that the utility is at all times required to furnish adequate service to the public and to construct plant and facilities for enlargement and improvement of its service. It also recognizes that a utility should earn a return sufficient to inspire confidence in the financial soundness of the enterprise so that it can raise the necessary capital on reasonable terms to discharge its duty to the public.
The determination of a fair return to provide the public with adequate service is a question of fact within the legislative realm of rate-making. The rate of return in any given case calls for expert judgment not bound by any hard and fast rule or set formula. That judgment has been entrusted by the legislature to the Commission. This Court's inquiry ordinarily goes no further than to ascertain whether there is evidence to support the findings of the Commission. Alabama Gas Corp. v. George C. Wallace, as Governor, 293 Ala. 594, 602, 308, So.2d 674 (1975).
In the case at bar, however, we have a rate case where the constitutional issue of confiscation is raised. Therefore, we must recognize the distinction between the limited scope of review when the action of the Commission is within the sphere of legislative authority and the broad scope of review which must be afforded when the question is whether the Commission has acted beyond the boundaries of legislative authorities. It is clear from our cases that a duty rests on this Court to examine the order of the Alabama Public Service Commission on the issue of confiscation and the schedule of intrastate rates and in this connection to exercise our independent judgment on both the facts and the law involved. *156 Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., 253 Ala. 1, 42 So.2d 655 (1949). Of course, the ultimate question in every rate case is a fair rate of return from a predetermined rate base. What will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a matter more or less of approximation, about which conclusions may differ. State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975). The conclusions of the parties in this appeal differ widely.
In their briefs, and during oral argument, General Telephone and the intervenors used complicated mathematical computations to show, respectively, that the Commission order was confiscatory, on the one hand, and completely reasonable and just on the other hand. In fact, the intervenors said they "parted company" with the Commission's order in some instances. They did not cross-appeal, however.
The main disagreement, though not the only one, between the parties revolves around a question of how to treat $13,783,000 of unamortized investment tax credits and deferred income taxes. The telephone company contends that these items are properly includable in the rate base since the deferrals were included in the capital structure at zero cost. The company cites a statement by the Alabama Public Service Commission in Re South Central Bell Telephone Co., Docket 16392, 89 PUR 3 Ed. 519, 522 (1971), in support of its position. There, the APSC said:
"It was also proposed that we should eliminate the accumulated income tax deferrals associated with the accelerated depreciation and unamortized investment tax credit reserve from the company's rate base. These items were included by the company in the rate base, but were assigned a zero rate of return. Intervenors' witnesses agreed that the practical result is the same either way. We have handled this problem below in our treatment of rate of return so that the company will not earn on the accumulated tax deferrals or investment tax credit reserve. In view of our treatment of rate of return, these items should not be eliminated from the rate base. This treatment is not inconsistent with intervenors' proposals."
Our research shows that regulatory commissions are not in harmony on the treatment which should be given to these socalled "deferrals." A majority of regulatory agencies appear to exclude unamortized investment tax credits and deferred income taxes from the rate base on the ground that they represent customer contributed costfree capital. See PUR Dig. 2 Ed. Vol. 9 § 192.1, Valuation, at 7040. It appears that even the Alabama Public Service Commission has on at least one occasion excluded such cost-free capital from the rate base.[2]
Even though the "confiscation" question was not raised in State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975), what this Court said there is abundantly true here. There, this Court opined:
"The ultimate question in a rate case is a fair rate of return from a predetermined rate base. Various formulae and complicated calculations have been developed by experts in the field of rate making in determining first, a reasonable rate base, and second, a fair rate of return on such reasonable rate base. In State of Alabama et al. v. Southern Bell Telephone and Telegraph Co., 274 Ala. 288, 148 So.2d 229, we quoted the following from the book `A Telephone Rate Case' by E. D. Smith:
"`What will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a *157 matter more or less of approximation, about which conclusions may differ; * * *'
"In the opinion in State of Alabama et al. v. Southern Bell Telephone and Telegraph Co., supra, at page 297, 148 So.2d at page 237, this court wrote:
"`The above, we think, demonstrates the difficulties confronting the court in the determination of a rate case. The record in such a case is abundant with the testimony of experts who demonstrate their conclusions by varied formulae and computations. The ultimate question of a fair rate of return should not be a composite of the results mechanically reached by these formulae, with little regard given to the question sought to be determined, that is, the fair rate of return.'" [Emphasis added.]
The telephone company argues that the record affirmatively shows that the 7.36% return on rate base will not result in an 11.05% return on equity, which the company contends the Commission found was reasonable.
Intervenors, on the other hand, take the same evidence and arrive at a totally different rate of return to equity. They accomplish this primarily by deducting the "deferrals"  or cost-free funds  from the capital structure.
Under one method, the intervenors say that the record shows that 93.06%[3] of the plant in-service is invested capital and the balance is in the cost-free funds. They argued orally:
Now that computes very briefly, taking everything that the company presented, 55% debt, 44% equity and 1% preferred stock  you get down to where the Commission found that the net earnings were $3,988,890.00. That was the Commission's finding in its original order, and that computes out to a rate earned on common stock of 10.66%, if you take that, and that's in this record. Now, I state to you that a rate of return of 10.66% or 11.03% (sic) as the Commission found, because they made an adjustment I am going to tell you about, a minor adjustment  if you take the 10.66% or 11.03% (sic) return to common equity, that is a far cry from confiscation  and the record in this case shows it."
A higher rate of return on common equity is accomplished by the intervenors under their second computation.
Here's the argument:
"This record shows, without any question, and they don't deny it in their briefs, that they calculated their income tax returns, and filed them, with the debt cost of 6.77%. This record shows, *158 and they don't deny it, and when they came in and asked for rates before the Commission, they set up a debt cost of 7.42%. That amounts to some money. And then the Commission, I don't know why, this is where we parted with the Commission, the Commission then found a debt cost of 6.95%  more than they swore they are paying at the debt cost on the income tax return  and we say the Commission gave them every consideration, where we said in our argument that it should be 6.77%  that is exactly what they swore to when they filed their tax returns  but in any event, they allowed a 7.42% * * * that calculates a rate of return of 11.32% on common. Now, I say that when you talk about 10.66% under one approach  when you talk about 11.36% on common,  if you use your 6.77%, you are obviously not discussing or concerned with any issue of confiscation."
Faced with these conflicting calculations which are based upon the same record, and with the duty to make a determination of the question upon our independent judgment as to both law and facts, we find that the best way to determine what actually happened would be to remand the cause to the Commission for a limited reopening of the hearing.
It has been said that "[E]laborate calculations which are at war with realities are of no avail." Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 164, 54 S.Ct. 658, 663, 78 L.Ed. 1182, 1191 (1934). If the opinions and prophecies of the experts were wrong, and confiscation, in fact, did occur, we would be under a duty to make sure that the utility received a reasonable return on the value of the property used at the time that it was being used for the public service. Alabama Public Service Commission v. Southern Bell, supra.
The telephone company argues in brief:
"In the present case, since the Commission said that the rate of return earned by the Company under its existing rates produced a fair rate of return on rate base, the question no longer remains whether the Company can earn an 11.05% rate of return on equity. It is a fact that the 7.36% return on rate base only produces 7.93% return on equity, far below the 11.05% found reasonable.
"Courts reviewing Commission decisions have consistently held that it is prima facie confiscation if the rates prescribed by the Commission do not produce the return on equity for the Company which the Commission prophesied or predicted the Company could earn."
The company cites the New York decision in New York Tel. Co. v. New York Public Service Commission, 29 N.Y.2d 164, 324 N.Y.S.2d 53, 272 N.E.2d 554, 556 (1971), in support of the above-quoted argument. There, the court remanded the cause to the Commission to reopen the hearing to determine, from actual experience, the effect of the Commission's order. There, the Court of Appeals of New York held that where, according to the telephone company's figures, the actual experience yielded a significantly lower return than that deemed reasonable by the Public Service Commission, the refusal of the Commission to reopen proceedings to consider the actual operating experience of the company in arriving at a proper rate was arbitrary. The court said:
"The majority of the Commission does not deny confiscation, but was of the opinion that the Company could by way of a new rate proceeding secure whatever relief it believes it can justify under the changed conditions. The dissenting Commissioners pointed out that the evidence was clear that there was a present confiscation of the Company property and it was no answer to invite the Company to file new rates which would again be subject to suspension, during which period the Company would be accorded the *159 privilege of continuing its operations under the alleged confiscatory rates.
* * * * * *
"The law is well-settled that the Commission may not rely on a reckoning when actual experience is available and establishes that the predictions have been substantially incorrect. (West Ohio Gas Co. v. Public Utilities Comm. [No. 2], 294 U.S. 79, 82, 55 S.Ct. 324, 79 L.Ed. 773.) In Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 164, 54 S.Ct. 658, 663, 78 L.Ed. 1182 the court said, `Elaborate calculations which are at war with realities are of no avail'. This principle applies not only in cases where the rate proceeding fixes the rate but especially where the Commission directs refunds. (West Ohio Gas Co. v. Public Utilities Comm. [No.2], supra). There the court said (294 U.S. p. 82, 55 S.Ct. p. 325): `To prefer the forecast to the survey is an arbitrary judgment.' In a recent case, Boston Gas Co. v. Department of Public Utilities, [359] Mass. [292], (269 N.E.2d 248, pp.257-259, 1971) the court held that the Commission must consider evidence of attrition which has actually occurred since the test period. The Massachusetts case rationale is not new. Commissions are bound to take into account drastic changes in economic circumstances. (See Atchison, T. & S. F. Ry. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273.) This court made this clear in People ex rel. Consolidated Water Co. of Utica v. Maltbie, 275 N.Y. 357, 367-368, 9 N.E.2d 961, 964, app. dsmd. 303 U.S. 158, 58 S.Ct. 506, 82 L.Ed. 724 in this statement: `If the opinion or prophecy of the expert witnesses given in May, 1932, was proven wrong by events occurring during the interval, the commission could, of course, not base any finding upon the discredited opinion. If the commission was bound to take judicial notice of such events, its decision must be based upon them rather than upon the discredited prophecy. If proof of such events was necessary, it might be offered by the party who challenged the opinion. In any case the party who attacks the correctness of the decision must show that intervening events have destroyed the force of opinion testimony upon which the decision is based.'
"Where there is a great disparity between the predicted rate of return found necessary by the Commission and the return actually earned, a suitable adjustment should be made to reflect the attrition trend or the erosion that has taken place. In Matter of Bronx Gas & Elec. Co. v. Maltbie, 271 N.Y. 364, 375, 3 N.E.2d 512, 516, the court said: "Experience"  how much better this is than expert testimony, whether dealing in history or prophecy.'
"Turning to the suggestion made by the Commission that the Company is restricted to the initiation of a new rate proceeding, it is only necessary to point to the comment made by Justice Cardozo in West Ohio Gas Co. v. Public Utilities Comm. (No. 2) (supra, 294 U.S. p. 83, 55 S.Ct. p. 325): `Present confiscation is not atoned for by merely holding out the hope of a better life to come'."
The Commission, in its order, has determined that a 11.05% return to equity is just and reasonable. This finding is supported by substantial evidence in the record. If the 11.05% return on equity has not been produced, it would be an indication that the overall rate of return of 7.36% was not sufficient, from the outset, to result in a fair rate on equity. If however, experience shows to the contrary, then the only question remaining is whether the prescribed rates of return meet the legal standards to be applied where confiscation is alleged. In view of the wide variations between the parties on the prospective returns that would result from the order, it is appropriate to test those returns by a practical yardstick  the actual experience under the order.
*160 The remand of this case to the Commission should not be considered as a routine procedure which the Court will follow when confiscation is alleged. Ratemaking is legislative, and not judicial. Alabama Public Service Commission v. Southern Bell T. & T. Co., 253 Ala. 1, 42 So.2d 655 (1949). While a remand will not always be appropriate, neither will it be inappropriate.
When this Court finds it "expedient" to do so, it can remand a cause to the Commission for further proceedings or evidence. Title 48, Section 82, Code; Alabama Public Service Commission v. Atlantic Coast L. R. Co., 253 Ala. 559, 45 So.2d 449 (1950). This Court has remanded causes to the Commission in prior cases. In Alabama Public Service Commission v. Southern Bell T. & T. Co., 268 Ala. 312, 106 So.2d 163 (1958), this Court said:
"Before a decision can be made finally as to whether rates and charges approved by the Commission are reasonable and just to both the Company and the public, there must be a new determination by the Commission of the `reasonable value' of the Company's property in accordance with what has been said in this opinion and a new rate order approved. If, after such redetermination and refixing of rates, the Company feels it is aggrieved to the exent warranting appeal to the courts, then that course will be open to it. The courts stand ready to protect the rights of a utility as well as the interests of the public. However, we would emphasize that the responsibility for fixing rates and charges which are reasonable and just to both the utilities and the public rests with the Commission and not with the courts. So long as the Commission pursues its statutory authority, within constitutional limits, the courts should not interfere with its determinations.
"The decree of the circuit court is reversed and the cause is remanded to the Commission for further proceedings in accordance with this opinion. In the meantime, the supersedeas order made in the circuit court, and the bonds given pursuant thereto, as required by law, shall remain and continue in full force and effect until final disposition of this cause. See: Birmingham Electric Co. v. Alabama Public Service Commission, 254 Ala. 140, 157, 47 So.2d 455."
We elect to remand this case. Under our statutory scheme, the company will not be harmed since it has been permitted to supersede the order of the Commission pending a judicial review. There is no danger of irreparable harm to the subscribers either, as the excess, if any, of the proposed rates over that authorized by the Commission after remand would be refunded.
As we view the matter, the Commission has determined that an 11.05% return to equity is reasonable.
This rate of return to equity might become unreasonable because of changed economic conditions. If the company thought the rate was too low, it could file a rate hike proposal. If these intervenors thought the 11.05% return to equity became unreasonable because of changed economic conditions, they could file a complaint and charge that the rates were unfair and unreasonable; likewise, the Commission, "whenever it deems that the public interest so requires" may make investigation. The whole purpose of rate-making is to insure that the rates "shall be reasonable and just to both the utility and the public." Title 48, §§ 52, 57, Code.
In view of what we have said, we remand this cause to the Commission with instructions to reopen the hearing within sixty days after receipt of the certificate of judgment from this Court for the limited purpose of determining the actual rate of return earned under the rates allowable on the Company's property devoted to public service, as defined in the statute. The Commission, after considering this additional *161 evidence, is directed to determine whether the rate of return allowed by the order here on appeal produced a return to equity of 11.05% which the Commission has determined was reasonable. If not, the Commission should approve a new rate.
In the meantime, the supersedeas order made in the circuit court, and the bonds given pursuant thereto, as required by law, shall remain and continue in full force and effect until final disposition of this cause. Alabama Public Service Commission v. Southern Bell T. & T. Co., 268 Ala. 312, 106 So.2d 163 (1958).

REMANDED WITH DIRECTIONS.
MERRILL, JONES, ALMON and EMBRY, JJ., concur.
HEFLIN, C. J., and BLOODWORTH, FAULKNER and SHORES, JJ., dissent.
BLOODWORTH, Justice (dissenting).
I most respectfully dissent.
In Mr. Justice Maddox' majority opinion, he writes that General Telephone argues (for reversal) two basic issues: (1) that the evidence is insufficient to sustain the APSC's finding that a 7.36 percent rate of return on the rate base is reasonable; and, (2) that the rate of return to equity is not 11.05 percent as found by APSC. Justice Maddox concludes, "In short the primary issue . . . is that the rate of return [7.36 percent] is confiscatory."
As to the first inquiry, I understand the case is remanded to the APSC for a determination as to whether the 7.36 percent rate of return on the rate base has produced a return to equity of 11.05 percent according to "actual experience."
The main disagreement between the parties, the majority opinion states, is how to treat $13,783.000 of unamortized investment tax credits and deferred income taxes. The opinion concludes that a majority of regulatory agencies appear to exclude this item from the rate base on the ground that it represents "customer contributed cost-free capital." Is it not our duty to determine which view this Court should take in handling this item ?
It seems unwise, to me, to set this precedent by remanding this case to the APSC to determine "from actual experience, the effect of the Commission's order." Of course, actual experience is always better than predictions as to future performance. But, if this case is remanded to determine "actual experience," why shouldn't we do so in all such rate cases when the question of "confiscation" is raised? In view of the fact that the APSC functions in a legislative capacity, it seems perfectly proper that it act "prospectively."
Although this Court has remanded cases to the APSC previously, it was not to determine "actual experience" vis-a-vis the issue of confiscation. In Alabama Public SerCom'n. v. Southern Bell T. & T. Co., 268 Ala. 312, 106 So.2d 163 (1958), cited by the majority, the case was remanded because the Commission erred in excluding costs of reproduction, inter alia.
It may be appealing to remand to get the benefit of "actual experience." But, to do so in every case will place an unreasonable burden of delay on litigants, on the APSC, on the courts, but most of all on those least able to bear the burden, the consumer. Remandment will delay unduly the time it takes rate cases to journey through the courts.
Thus, I must conclude that we should not remand this case but should ourselves make a determination from the record as to whether the 7.36 percent rate of return is confiscatory or not.
HEFLIN, C. J., and FAULKNER, and SHORES, JJ., concur.
NOTES
[1] Docket No. 16474 refers to an application filed by General Telephone with the Alabama Public Service Commission on 23 September, 1971, seeking an increase in intrastate rates from its Alabama customers in the amount of $2,504,450 annually. For a complete history of that case, see State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975).
[2] "The commission deducted from a gas company's rate base, as an item of cost-free capital, a substantial amount representing accumulated deferred income taxes arising from the use of accelerated depreciation under the Internal Revenue Code. Re Mobile Gas Service Corp., Docket 14908, Sept. 12,1960." PUR Dig. 2 Ed.Vol. 9, § 192.1, Valuation, at 7040.
[3] "COMPANY APPENDIX A CORRECTED*

ASSETS PLANT
Line 13 Total Tel. Plant Less Res. $ 423,376,672
Lines 26-28 Cash (Sum of 3 Items) 789,915
Line 40 Material & Supply 3,459,647
 _____________
 $ 427,626,234
LIABILITIES CAPITAL
Line 14 Capital Stk, Lines 6, 10 & 13 $ 195,794,757
Line 22 Long Term Debt 182,162,000
Line 27 Short Term Debt 20,000,000
 _____________
 $ 397,956,757
 Per Cent Capital of Plant 93.06%

* ALL AMOUNTS TAKEN FROM RECORD, PAGE 1883
NOTE: The above factual information is per the Balance Sheet of GTSE at 4/30/73"