## ARKANSAS WESTERN GAS COMPANY v. ARKANSAS PUBLIC SERVICE COMMISSION

79-171                                    588 S.W. 2d 424

### Opinion delivered October 15, 1979
### (In Banc)

[Rehearing denied November 19, 1979.]

*Ball & Mourton, Kathleen D. Gardner* and *Charles F. Scharlau,* for appellant.

*Robert H. Wood, Jr.,* for appellee.

GEORGE ROSE SMITH, Justice. The appellant, Arkansas Western, is a public utility engaged in the distribution of natural gas in 65 towns and communities, in 11 counties, in northwest Arkansas. In 1975 it filed with the Public Service Commission a proposed rate schedule increasing its charges

to some of its customers. After extended hearings the Commission approved part of the requested increases in rates and directed Arkansas Western to file redesigned rate schedules conforming to the Commission's findings. The circuit court affirmed the Commission's order. Arkansas Western now argues that the Commission's findings are erroneous and confiscatory in four particulars.

I. *Annualized Depreciation.* The test year selected for the rate calculations was 1974. The Commission allowed annualized depreciation of $255,795 as an operating expense for the year, and, as a balancing item, added that amount to the depreciation reserve as of the end of the test year, thereby decreasing the rate base by the same amount. Arkansas Western accepts the figure $255,795 as a correct expense allowance, but it insists that the Commission should not have made a like addition to the depreciation reserve.

It is plain enough that if a certain amount of depreciation is allowed as an operating expense of the utility company, then a like amount must eventually be deducted from the rate base. Otherwise, the ratepayers would pay for the same item twice, once as an operating expense and a second time as a return on plant value which had not been correspondingly reduced to reflect the depreciation. The problem is essentially one of accounting, for the test year is admittedly a fictitious one in which no revenue is actually received nor any expenses incurred.

Arkansas Western, however, quite properly presents the issue as one of law, the members of this court not being qualified to explore difficult problems in accounting. As a matter of law, all the authorities seem to support the position taken by the Commission. Counsel for the Commission cites administrative decisions from five different states, all reaching the same conclusion. Typical is the discussion by the Kansas State Corporation Commission in *Re United Telephone Co. of Kansas,* 6 PUR 4th 350 (1974), where it was said:

> The obvious fair matching of operating expenses, capital and rate base necessitates that if the company is alloted

twelve months of depreciation expense as recorded on its books, then twelve months of depreciation must be credited to the reserve. Likewise, in a rate proceeding, if the company is to be allowed an additional depreciation expense in the form of new accrual rates, and an adjustment for year-end plant balances, likewise the credit should be made to the reserve.

This commission has consistently held that adjustment to depreciation expense should be offset by a credit to the reserve and we have traditionally approved the types of adjustment proposed by the staff. We find that the proper matching of expense and rate base requires the annualization be made to both in this case.

In its reply brief Arkansas Western recognizes that the cases cited are contrary to its argument, but it insists that "the deduction of the annualized depreciation of $255,795 for the test year 1974 from the 'rate base' is incorrect from a theoretical rate making standpoint and as a matter of law." As to theoretical rate making, the accounting problem embraces not only the deduction of the annualized depreciation at the end of the year but also the coincident addition of new construction completed during the test year. It is evident that the continuous process of depreciation must be continually offset by new construction. How to reconcile those two constants is a matter not discussed in the briefs and one upon which we must defer to the expertise of the Commission. As far as the law is concerned, the company has not submitted any legal argument in answer to the conclusion unanimously reached in other jurisdictions.

II. *Minimum Bank Balances*. Arkansas Western asked that the rate base include minimum bank balances of $404,500. The Commission denied that request, stating that in calculating the $381,533 allowance for "working capital" it had taken into consideration "the requirements of the Company as relate to the need for having funds available on deposit in their bank accounts to meet their normal financial obligations." The Company contends that the requested minimum bank balances should have been approved.

Arkansas Western maintains about 35 bank accounts. Two out-of-state accounts do not affect the present issue, as they are depositories for payments of bonded indebtedness and stockholders' dividends. A substantial non-interest-bearing checking account is carried with the Worthen Bank in Little Rock, where Arkansas Western has a $3,000,000 line of credit. Similar checking accounts are also carried with two Fayetteville banks, where Arkansas Western has smaller lines of credit. The other accounts are not shown to have much bearing on the present issue. Those accounts are maintained in the towns where the company does business and are used for making local payments and for depositing local receipts pending a transfer to one of the three lead accounts.

The Company made no effort to show just how the precise minimum requested, $404,500, was arrived at. It seems to have been used by the Company for many years. In 1963 the Commission approved minimum balances of $404,-000. In 1969 the Commission disallowed the same requested minimum of $404,000. *Re Arkansas Western Gas Co.*, 81 PUR 3d 399, 402 (1969). In the present case two company witnesses — Joe Crumpler, Arkansas Western's secretary-treasurer, and William V. Martin, the prospective successor to that office — testified that $404,500 should be allowed for minimum bank balances. Each statement was a conclusory opinion given by an interested witness, as neither man explained how that particular figure had been arrived at.

A second difficulty with the Company's proof, as the Commission pointed out, is that it did not separate basic minimum bank balances, which are kept to avoid bank service charges, from compensatory balances, which are kept to maintain the company's credit standing with the three lead banks. Five interested witnesses — two company employees and one officer from each of the three lead banks — all testified, essentially as a matter of opinion, that Arkansas Western's credit standing with the banks would be improved, with a corresponding ability to obtain loans at a lower interest rate, if the Company kept substantial non-interest-bearing checking accounts with the banks.

No actual figures were given, doubtless because Arkan-

sas' usury law deters a bank from requiring compensatory balances. As the witness Penick, an officer of the Worthen Bank, expressed it: " 'Worthen' does not require, nor does it ask, either in writing or by understanding, a compensating balance. However, adequate balances are one of the factors that go into our pricing procedure in order to reach our target yield." The witness went on to say that in banking circles a prime loan is defined as one made for a short term to a borrower with the very best credit standing who maintains a bank balance of approximately 20% of the loan while it is outstanding. The Company witness Crumpler testified that Worthen does require a 20% compensatory balance, "upon which we pay interest, but we don't have the use of the money because we have to leave it on deposit."

As we have said, no actual figures are given to show the benefit to be derived by the ratepayers from compensatory balances. The disadvantages to the ratepayers, however, are quite apparent. It would cost them about $84,000 a year (as conceded in effect by the Company witness Martin) to maintain minimum balances of $404,500 as part of the rate base. Management would have no incentive to resist the lending banks' requirements that compensatory balances be maintained, because the stockholders would receive a return on the money anyway. And, finally, the Company would in actuality be paying a higher interest rate on its borrowings, but the ratepayers would not be getting the benefit of the increased interest expense as a deductible item for income tax purposes. *Re Boston Edison Co.*, 16 PUR 4th 1 (1976).

The Company made hardly any effort to separate compensatory bank balances from other checking-account requirements. The witness Lewis testified that his "informed estimate" was that approximately $150,000 in deposits in all the Company's accounts would be required to maintain checking privileges. Lewis, however, did not explain the basis for his informed estimate. He did say that a number of variables were involved in the estimate and that for an accurate determination each item deposited would have to be identified. Moreover, Lewis is not an officer of the Company, with first-hand knowledge of its various accounts. He is an officer of one of the Fayetteville lead banks.

The question, as we have often said in reviewing issues of fact turning upon the substantial evidence rule, is not whether the testimony would have supported some other conclusion, but whether it supports the conclusion reached by the trier of the facts. The Commission stated that it had considered the Company's banking needs in making an allowance for working capital. There is a marked absence of actual figures with respect to the entire question of the requested allowance of $404,500 for minimum bank balances as a part of the rate base. We have no sound basis for saying that the Commission was wrong in its final summation: "Without a precise determination of what amount specifically is to be designated a 'compensatory balance,' and the production of evidence as to the benefits and the costs to be derived from these balances, the Commission has insufficient information on which to act." The burden was on the applicant to supply that information.

III. *Rate of Return on Equity Capital.* This point has to do with the proper return to the common stockholders upon their investment in the Company's public utility business. The Commission followed the generally accepted rule, which was stated long ago in *Bluefield Water Works & Improvement Co. v. Public Service Commn. of West Va.*, 262 U.S. 679, 692-3 (1923):

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country *on investments in other business undertakings which are attended by corresponding risks and uncertainties;* but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. [Italics supplied.]

The standard to be followed — a rate of return comparable to that being made by other businesses attended by corresponding risks and uncertainties — is unquestionably a matter of judgment and opinion, not of demonstrable fact. The Company's expert witness, Samuel Joseph, was of the opinion that the rate of return should be 14%. The staff's ex-

pert witness, Basil Copeland, recommended a return of 9.63%. Joseph used the earnings-price ratio method of estimating a fair return; Copeland used the capital asset pricing model. The Commission preferred Copeland's method, but found his figure too low. The Commission adopted, instead, the average rate shown on the staff's Exhibit Two, which listed 20 other utility companies' rates of return. That average, as corrected on rehearing, was found to be 12.33%. The situation before us is comparable to our review of a jury verdict in a condemnation case, when the jury must reconcile conflicting expert testimony. We have no basis for saying that the Commission's conclusion is not supported by substantial evidence or that the return is so low as to be confiscatory.

IV. *Adjustment of Capital Structure.* Arkansas Western, in addition to its public utility business, also explores for and produces natural gas, which it sells to its ratepayers under our "fair-field price" law. Ark. Stat. Ann. § 73-1903 (Repl. 1957). Over a period of years the Company's stockholders, instead of distributing the profits from this nonutility business as dividends, have allowed the profits to remain in the Company as a reinvestment. For the 1974 test year those retained earnings amounted to $11,716,227.

The Commission's staff, in presenting its case against the allowance of the proposed increases in their entirety, made an adjustment by which $6,834,021 was eliminated from retained earnings and was assigned to other accounts. The staff's principal witness, Copeland, in explaining the adjustment, testified:

> Since these retained earnings are the result of fair-field pricing and not the result of the retention of earnings on the rate base, the capital structure used to derive the weighted average cost of capital (and rate of return) must be adjusted or the stockholders will earn a return on retained "earnings" that were actually supplied by the customers.

Copeland's approach cannot be sustained, for various reasons. First, a utility company is not required to "give up for the benefit of future subscribers any part of its ac-

cumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future." *Board of Public Utility Commissioners* v. *New York Telephone Co.*, 271 U.S. 23, 32 (1926). Second, it is impossible to earmark the particular dollars that went into the retained earnings account. And third, the fair-field price law provides that in natural gas utility cases the fair value or reasonable market price of natural gas produced by the utility company shall be allowed as an operating expense. § 73-1903, *supra.* Copeland's approach in effect would deny Arkansas Western the benefit of fair-field pricing.

The Commission quite correctly rejected Copeland's approach, saying in its findings:

> Mr. Copeland, for the Staff, adjusted the capital structure to reflect recent sources and uses of funds. We do not adopt the Staff's *method* of adjusting the capital structure, but we find the end result reasonable. The President of [Arkansas Western] , Mr. Scharlau, testified that if the Company's balance sheet were restated to give effect to F.A.S.B. (Financial Accounting Standards Board) Rule No. 9, about six million dollars would be taken out of retained earnings and be accounted as deferred taxes . . . The effect would be similar to that resulting from Mr. Copeland's restatement of capitalization.

Thus it will be seen that although the Commission rejected Copeland's method, it reached the same result — the elimination of $6,834,021 from retained earnings — by relying upon Scharlau's testimony. No other supporting evidence was mentioned by the Commission, nor has any been cited by counsel.

On what is essentially an issue of fact we cannot regard Scharlau's testimony as substantial evidence supporting the Commission's finding. Scharlau was asked about a trip he made to Washington to testify against a proposed F.A.S.B. rule (which apparently was not in fact adopted), soon after the depletion allowance was abolished by Congress. Scharlau explained that he was not an accountant and would have to

use layman's terms. He said the Board's first proposal was extremely drastic and "would have changed us to a deficit of something like minus two dollars and seventy-five cents a share, almost three dollars a share, deficit earnings. Scharlau said that if the Company had decided to restate the balance sheet, the retained earnings account would have been greatly diminished.

Q. Do you have an estimate on that amount that you could give the staff?

A. Well, I just have to horseback it. Three bucks a share, and we have a million seven shares outstanding — we're getting close to six million dollars.

Thus, first, Scharlau's testimony was not an assertion of fact but a speculation about what might have happened if the proposed drastic rule had been adopted. Second, Scharlau's horseback estimate of 1,700,000 shares at three dollars a share comes to only $5,100,000, which is about $1,700,000 less than Copeland's precise figure of $6,834,021, which the Commission approved as a reasonable end result. The Commission's approval of the adjustment in the Company's capital structure must be set aside for want of any substantial evidence to support it.

The Circuit Court's judgment is affirmed except as to Point IV. On that point the judgment is reversed and the cause remanded, through the circuit court, to the Commission, so that the Company's redesigned rate schedule may conform to the Commission's order as modified.

FOGLEMAN, J., not participating.

BYRD, J., dissents.

CONLEY BYRD, Justice, dissenting in part. The $404,500 bank balances that Arkansas Western wishes to place in its rate base were broken down by the witnesses to include $150,000 for "float requirements" and $120,000 for "bank service costs." With respect to the latter two items, John M.

Lewis, president of First National Bank of Fayetteville, testified that "float" represents the number of days from the date of the deposit of a check to a customer's account that it takes for the check to reach the drawee bank, be paid by the drawee bank, and the proceeds therefrom returned to the bank of deposit to be available for withdrawal or checking by the customer. Based upon an average daily deposit of $60,000 per day he stated that it would take $150,000 spread out among the 32 collecting banks used by Arkansas Western to cover the "float requirements."

With respect to "bank service costs" Mr. Lewis testified that the First National Bank of Fayetteville had made cost studies and found that it cost more than $0.04 to handle each check run through its bank.

When the "float requirements" of $150,000 are added to the $120,000 necessary to cover "bank service costs," the total amount equals $270,000 that I contend should have been added to the rate base.

By multiplying the 12.33%, Cost of Capital allowed by the Commission, against the $270,000, *supra*, I arrive at an annual cost to the rate payer of $33,291. When the annual cost is divided by the number of collecting banks (32), I find that the monthly return to each of the collecting banks to be something like $86.70 for its total services to the customer and Arkansas Western. Calculated another way, the average monthly costs to the 56,963 customers of Arkansas Western amounts to less than five cents per month—*i.e.* $0.0483 per month per customer. Since the only testimony in the record is that it costs a bank more than four cents per check to handle it, I must conclude that there is no substantial testimony in the record to support the Commission's refusal to allow the "float requirements" of $150,000 and the "bank service costs" of $120,000 in the rate base.

For the reason stated I respectfully dissent from that portion of the majority opinion that disallows those items.