359 So.2d 776 (1978)
ALABAMA POWER COMPANY, a corporation
v.
ALABAMA PUBLIC SERVICE COMMISSION et al.
SC 2052, 2098.
Supreme Court of Alabama.
April 7, 1978.
Rehearing Denied June 9, 1978.
*777 John Bingham, Birmingham, for Steiner, Crum & Baker, and Lange, Simpson, Robinson & Somerville, and Balch, Bingham, Baker, Hawthorne, Williams and Ward.
Maurice F. Bishop, Birmingham, for Honorable George C. Wallace, as Governor of the State of Alabama.
William J. Baxley, Atty. Gen., and Jerry Weidler, Asst. Atty. Gen., Carl L. Evans, Montgomery, for appellee, Alabama Public Service Commission.
Donald W. Stewart, Anniston, for individual interveners.
On rehearing James D. Brooks, Mobile, for appellees-intervenors.
Richard S. Riley and Alton B. Parker, Jr., amicus curiae, Birmingham, for Community Chest, United Way of Jefferson, Shelby and Walker Counties, et al., in opposition to disallowance of charitable contributions for rate making purposes as contained in Commission's order which was affirmed by trial court.
James C. Barton and Gilbert E. Johnston, Jr., amicus curiae, Birmingham, for Alabama Press Association, et al., in support of right of Power Company to charge its advertising as an operating expense.
ON REHEARING
PER CURIAM.
The original opinion and each special concurring and dissenting opinion are hereby withdrawn, and the following opinions are substituted therefor.
On November 26, 1975, Alabama Power Company filed with the Public Service *778 Commission a revised schedule of increased rates and charges for a $106.9 million annual increase based on its test year, beginning July 1,1974, and ending June 30,1975. The Commission issued a zero order dated June 25, 1976, stating that "the said schedules filed herein on November 26, 1975, should be rejected and cancelled." The Commission supplemented its order with an opinion dated July 12, finding that under its existing rates, the Company was earning a return on its rate base of 6.37%, and a return to its common equity of 13.17%.
The Company appealed the Commission's order to the Circuit Court of Montgomery County. The trial judge set aside the order and remanded the case to the Commission with instructions to:
"Fix and allow rates and charges which will provide 2.27 times interest coverage on first mortgage bonds outstanding at the end of the test period (at June 30, 1975), plus those proposed to be outstanding at the end of the year immediately following the test period (June 30, 1976) in the total amount of $1,233,014,000 with an annual interest requirement of $94,552,156."
On August 23, the Commission granted a $23.3 million increase pursuant to the court order (see PSC order of August 23, 1976, Appendix) without specifying the rate of return after remand. The Company appealed that order to the Circuit Court, requesting $53.4 million. The trial court upheld the Commission, but it did permit the Company $30.1 million supersedeas. This is the difference between the increase granted and the amount the Company says should have been granted ($53.4 million less $23.3 million).

I
To this court the Company appealed the circuit court order, alleging confiscation. Thus, confiscation is the principal issue for review. On this issue, the court has a broad scope of review, but this Court neither makes the rates, nor substitutes its judgment for that of the legislative agency fixing the rates. In City of Birmingham v. Southern Bell Telephone & Telegraph Co., 234 Ala. 526, 176 So. 301 (1937), this Court stated:
"The Legislature may fix the rates or it may empower an agency, such as the Public Service Commission, to act in its stead in this regard. In either event, the courts are open for one who complains that by the exercise of the rate-making power he has been deprived of property without due process of law or that his private property has been taken for public use without just compensation. The courts act, therefore, for the purpose of holding the exercise of this legislative power within constitutional limits (Const. 1901, §§ 13, 23), but not for the purpose of making rates or substituting their judgment for that of the legislative agencies."
Cf. State of Alabama v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975).
Regarding confiscation, this Court has listed and discussed a number of controlling principles. See Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co., 253 Ala. 1, 42 So.2d 655 (1949); General Telephone Company of the Southeast v. Alabama Public Service Commission, Ala., 335 So.2d 151 (1976); Alabama Public Service Commission v. South Central Bell Telephone Co., Ala., 348 So.2d 443 (1977).
When the grain is separated from the chaff, the sole question is, has the Legislature unconstitutionally denied the utility just and reasonable compensationa fair return on its property. We hold that it has not.
The court-ordered increase covering bond interest was granted after the Commission adopted the Company's rate base of $2.7 billion, computed pursuant to Alabama Gas Corp. v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975). In its original order, the Commission granted a return to equity of 13.17%. After remand, the return is said to be 13.88%. This is higher than the return earned by the electric utility industry over *779 a 10-year period1964-1974. Statistical evidence shows that the industry rate of return has never exceeded 12.7%. Alabama Power Company's return ranged from a high of 12.5% in 1965 to a low of 8.6% in 1974. In 1975, the Company's return was 11.6%. The rate of return for the forty largest electric utility companies in the country ranged from 12.5% in 1969 to 10.7% in 1975. In Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co., this Court said that "the rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties," citing the rule from Bluefield Waterworks and Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176. The return to equity granted by the Commission is just and reasonable. In General Telephone Co. of the Southeast, a return to equity of 11.05% was considered to be just and reasonable.
The Company's rate base was adopted by the Commission without any opposition from intervenors. Using that rate base, the Commission found that 6.37% is a fair and reasonable rate of return on the statutory rate base. This was computed by dividing the earnings requirement (found by the Commission to be $173,237,375 by the rate base ($173,237,375 ÷ $2.7 billion). In General Telephone Co. of the Southeast, an argument between the parties was whether a 7.36% return on rate base would result in an 11.05% return on equity.
We have reviewed the testimony of the Company's expert witness who said that the Company should be afforded the opportunity to earn no less than 7.31% on the rate base. This testimony came before the appeal to the Circuit Court. After remand and the granted increase of $23.3 million, the overall return is close to the return suggested by the witness.
After considering the evidence, we opine that the rate of return on rate base found by the Commission is just and reasonable.
The rate base included construction work in progress amounting to $807 million. The Company says in brief that "the `Construction Work in Progress-Allowance for Funds Used During Construction . . .' treatment adopted by the Commission without any explanation, discussion or reason results in confiscation . . ." The Company cannot have its cake and eat it, too. It is proper to include construction work in progress in the rate base. But, where this item is included, the Allowance for Funds Used During Construction must be eliminated to prevent a double return. Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co. The Commission's treatment of this item did not result in confiscation. It has authority to establish accounting principles to be used by utilities under its jurisdiction. Tit. 48, §§ 41-42, Code of Alabama.
At the outset we said that confiscation was the principal issue for review. However, the Company, in brief, listed a number of items, and discussed them under the title of "Lack of a Fair Hearing; Arbitrariness." We pretermit discussion of all of those items, as we do not consider them to be dispositive of the principal issue.
We have examined the evidence, and upon considering it, do not find that the return, fixed by the Commission, amended by court order, is unjust, unreasonable, or confiscatory, except that a majority of the court is of the opinion that the Commission erred in disallowing advertising costs as will be shown in part III of this opinion.

II
The Company has been very generous in giving to charity. It has deducted its contributions as an operating expense. The Commission disallowed these as operating expenses deducted from operating revenues in determining the rate base during the test year. This action is alleged to be arbitrary.
While the charitable contributions are commendable, we are not aware of any reason why the consumer should make the contribution as opposed to the investor. Logic tells us that charitable contributions are not an operating expense. The Company, *780 being a monopoly, can operate without deducting charitable donations as an operating expense.
We hold that charitable contributions are not a proper operating expense for a utility, and the Commission's action was without error.

III
Although subject to regulation by the government, a utility, like any corporation, should be allowed to operate consistent with the free enterprise system to the extent possible.
Advertising is of vital importance to corporations in establishing and maintaining their public image, as well as in educating the consuming public. As such, it is a responsibility of the duly authorized manager of a utility to decide the type, quantity, or form of advertising which would most benefit the corporation in its continued growth. The Utility has the initial right to decide the amount and type of advertisement which comports with good management practices. The function of the Alabama Public Service Commission is that of regulation, and not of management. Petition of New England Tel. & Tel. Co., 115 Vt. 494, 66 A.2d 135 (1949). The Commission should not be allowed to interfere with the proper operation of the utility as a business concern by usurping managerial prerogatives.
The Supreme Court of the United States, in West Ohio Gas Co. v. Comm'n. (No. 1), 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935), said:
". . . A business never stands still. It either grows or decays. Within the limits of reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others. . . . When a business disintegrates, there is damage to the stockholders, but damage also to the customers in the cost or quality of service." (294 U.S. at 72, 55 S.Ct. at 321.)
Traditionally, courts have been reluctant to exclude such charges from operating costs. Newton v. Consolidated Gas Co., 258 U.S. 165, 42 S.Ct. 264, 66 L.Ed. 538 (1922); New England Tel. Co. v. Department of Pub. Util, 360 Mass. 443, 275 N.E.2d 493 (1971); Central Maine Power Co. v. Public Util.Comm'n., 153 Me. 228, 136 A. 2d 726 (1957); Public Serv. Co. of New Hampshire v. State, 102 N.H. 150, 153 A.2d 801 (1959). Many state utility commissions have taken this position as well. Re Hilo Elec. Light Co., 6 P.U.R. 4th 195 (Hawaii Pub.Util. Comm'n 1974); Re Interstate Power Co., 97 P.U.R. 3d 6 (Iowa Commerce Comm'n 1974); Re Kansas City Power & Light Co., 6 P.U.R. 4th 321 (Kan.Corp.Comm'n 1974); Re Consolidated Edison of New York, 41 P.U.R. 3d 305 (N.Y.Pub.Serv.Comm'n 1962).
Title 48, § 52, as amended, entitles the utility to "such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service." Advertising, under honest, efficient and economical management, can be an operating expense and reasonable advertising costs expended by a public utility should be allowed.
Therefore, the judgment of the circuit court, insofar as it affirms the disallowance by the Public Service Commission of reasonable advertising costs, must he reversed and the cause remanded to the circuit court with directions to remand the cause to the Public Service Commission for further proceedings not inconsistent with this opinion.
APPLICATION FOR REHEARING GRANTED; ORIGINAL OPINION WITHDRAWN. AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED WITH DIRECTIONS.
FAULKNER and EMBRY, JJ., concur in Part I.
TORBERT, C. J., and BLOODWORTH, MADDOX, JONES, ALMON, SHORES and BEATTY, JJ., concur in the result of Part I.
*781 FAULKNER and EMBRY, JJ., concur in Part II.
TORBERT, C. J., and BLOODWORTH, ALMON, SHORES and BEATTY, JJ., concur in the result of Part II.
MADDOX and JONES, JJ., dissent as to Part II.
TORBERT, C. J., and MADDOX, JONES, ALMON and SHORES, JJ., concur in Part III.
BLOODWORTH, FAULKNER, EMBRY and BEATTY, JJ., dissent as to Part III.
JONES, Justice (dissenting in Part II).
As to the contribution issue, I dissent and I would add the following. Private, investor-owned corporations are still permitted to operate public utility companies in Alabama. While these companies are governmentally regulated monopolies, they are not government owned; and, as nearly as possible, consistent with public interest, they should be permitted to operate within the free enterprise system, which includes public relations and competitive-type advertising.
Charitable contributions are an integral part of the composite advertising program. Then, too, there is the matter of corporate good citizenship. Does the mere fact that Alabama Power Company is a monopoly, selling its primary product (electricity), place it in such peculiar posture that the maintenance of a good corporate image is of no public benefit? It would be difficult to imagine that either advertising costs or charitable contributions could be handled with such reckless abandon by corporate management as to constitute an abuse to the public detriment. I would hold that First Amendment rights and the principles of free enterprise, even in the context of a monopoly, require that both advertising and charitable contributions should have been allowed as an operating expense, provided they were incurred "under honest, efficient and economical management."
In all other respects, I concur in the opinion of the majority.
MADDOX, J., concurs.