ON REHEARING
The original opinion is withdrawn and the following is the opinion of the Court. This is a direct appeal, pursuant to Code 1975, § 37-1-140, from an order of the Alabama Public Service Commission denying a rate increase. We reverse.
The intervenors in their brief on application for rehearing correctly point out that we inadvertently used an incorrect capital figure in a footnote. That footnote was added to the original opinion for illustrative purposes only, and did not form the basis for our conclusion that the rate of return allowed by the Public Service Commission is confiscatory.
Because of the assertions of counsel for the intervenors, and in view of the complexity of rate cases, we are substituting this opinion on rehearing so as to clarify certain claimed misleading language in the former opinion. These minor changes are for the sake of clarity and in no way alter our original judgment.
On January 23, 1976, Continental Telephone Company of the South (hereinafter "the Company") filed schedules of proposed rates with the Alabama Public Service Commission (hereinafter APSC). This rate request was denominated Docket No. 17123 and the APSC suspended the operation of the proposed rates, conducted hearings and generally investigated the merits of the proposed rate increases. By order of August 23, 1976, the APSC allowed the Company to file amended tariffs so as to provide a 1.3 million dollar increase in revenue. The APSC deferred the application of the rate increase to the Trussville, Alabama, exchange, noting that Trussville area subscribers had presented numerous service complaints. The APSC also undertook an independent review of the telephone service problems in Trussville. No appeal from this action was taken.
On October 4, 1977, another schedule of proposed rates was filed by the Company to become effective on November 2, 1977. The APSC (Docket No. 17453) suspended the operation of these new rates and set hearings for the winter and spring of 1978. As in the previous case, the APSC allowed the City of Trussville, the Chamber of Commerce of Trussville and certain other Trussville area subscribers to intervene. The intervenors presented evidence regarding the quality of telephone service. On May 2, 1978, the APSC denied the proposed rate increase.
The Company filed an appeal and an application for supersedeas in this Court on May 16, 1978. A hearing was set for May 24, 1978, and the application for supersedeas was argued and submitted. On May 31, 1978, this Court ordered the APSC to submit supplemental findings with respect to the following matters:
 1. The rate base and the rate of return thereon, and the method used to determine them;
 2. A financial statement showing net operating income;
 3. The method used in computing return to common equity;
4. Cost of debt capital;
5. Cost of equity capital; and
6. Cost of preferred stock.
On June 6, the APSC filed its response to this order and on June 9, 1978, the application for supersedeas was approved and this Court ordered the APSC's May 2 order superseded upon the filing of a 2.6 million dollar bond. This bond was filed on June 12, 1978.
The Company contends that the denial of its rate increase is tantamount to confiscation of property without due process of law and that confiscation of this character is proscribed under both the United States Constitution, Amend. 5 and *Page 1361 
Amend. 14, and the Alabama Constitution of 1901, art. 1, §§ 6 and 13. We have addressed this confiscation argument in the context of public utility rate cases before and it is settled that the functions of this Court are to examine both the law and the facts and to exercise independent judgment as to whether the rates fixed by the APSC fall within constitutional limits. Alabama Public Service Commission v. South Central BellTelephone Co., 359 So.2d 776 (Ala. 1978).
We have recently observed that several legal principles control the determination of a fair rate of return in order to avoid confiscation.
 I. The reasonable rate of return depends upon many circumstances. It cannot be developed by a rule of thumb calculation. It must be determined in the exercise of a fair, enlightened and independent judgment of all relevant facts. . . .
 II. The rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties. . . .
. . . . .
 III. The return must be sufficient to assure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service to the discharge of its public duties. . . .
. . . . .
 IV. In determining the reasonableness of rates it is necessary to consider the effect of the rates imposed in the light of the utility's present situation and in light of its requirements and opportunities. . . .
. . . . .
 When considering confiscation, `. . . we should remember the principle that the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property. . . .' [Citation omitted.]
Alabama Public Serv. Com'n v. South Central Bell,348 So.2d 443, 446 (Ala. 1977). See Alabama Public Serv. Com'n v.Southern Bell T. T. Co., 253 Ala. 1, 42 So.2d 655 (1949).
Moreover, we have noted that the effect of the applicable state statutes is to have the Public Service Commission determine utility rates under the theory of a fair rate of return based upon a fair and adequate rate base as distinguished from the cost of capital theory. South CentralBell, supra, at 446. State v. Southern Bell T. T. Co.,274 Ala. 288, 148 So.2d 229 (1962).
For purposes of clarity and reference, the concurring opinion of Public Service Commissioners McDaniel and Whatley issued in conjunction with the APSC's May 2, 1978, order denying the Company's rate increase will be set out below. It will also be useful to set out the APSC response to this Court's order requesting supplemental findings:
"DOCKET NO. 17453
 OPINION OF COMMISSIONERS McDANIEL AND WHATLEY
BY THE COMMISSION:
In view of recent increases in toll message rates, the crippling effect of inflation on the economy, and certain questions relating to adequacy of service, we are of the opinion that any increase in local service rates at this time should be denied and existing rates continued in effect until such time as the Company stands ready to certify and demonstrate to the Commission that the quality and reliability of service in all of its exchanges, including the Trussville exchange, is reasonable and adequate.
The effect of a denial of any increase in this proceeding is to provide the Company with a return on its common equity of 11.29% (see Appendix A) using the same capital ratios adopted by this Commission in its last rate order involving Continental *Page 1362 
Telephone Company, and updating the cost of debt and preferred capital.
We would expect the Company to move forward immediately to bring the quality of service up to a reasonable standard in all its exchanges. It seems that prompt correction of any existing deficiencies in service could reasonably be the basis for a further consideration of the Company's revenue requirement. We are of the opinion that an immediate program of inspection of the Company's property and finances should be initiated without delay, in order to fully inform the Commission of the progress being made.
It has been held by this Commission and other regulatory bodies, and recognized by judicial authorities, that there is a zone of reasonableness in arriving at a fair rate of return in any rate proceeding. Rates fixed above the zone of reasonableness have been held to be excessive while those below the zone of reasonableness absent extenuating circumstances, have been held to be confiscatory.
It is our opinion that while the existing rates of the Company provide a return on the low end of the zone of reasonableness, the condition of the economy generally, and the question as to adequacy of service, are such that the Commission's order of denial in this matter is reasonable and comports with the law of Alabama. In any determination of the amount of return to be allowed a utility on its capital dollars, the principal controversy is usually associated with the percentage return to be allowed on the utility's common stock equity. In most cases there is little if any, dispute surrounding the cost to be assigned to debt and preferred stock as these tend to be fixed amounts. This is true in this proceeding. Therefore, the amount to be allowed on the Company's common stock equity is of primary consideration. As adverted to hereinabove, existing rates will provide a return to total cost capital under the capital ratios adopted by the Commission in Docket 17123, of 8.16% (see Appendix A), a return of 11.29% on common equity (see Appendix B), and a return of 6.52% on the rate base of $38,463,449 (see Appendix C). Based on computations of the Commission staff it has been determined that an updating of the Company's preferred stock and debt cost, together with a hypothetical allowance of 12.50% on the common equity outstanding at test period end would result in an overall hypothetical return of 8.53% (see Appendix D) on cost capital. Application of this composite rate of return to the Company's total intrastate capital dollars associated with the Company's property at test period end (including Job Development Investment Credit) indicates a net operating income of $2,685,841 (see Appendix E). The Company's net operating income under existing rates approved herein is $2,507,457. General adherence to the principles adopted in Docket 17123 would thus indicate a hypothetical deficiency in operating income of $178,384 (see Appendix E) and a deficiency in rate revenue of $362,890 (see Appendix E). Actually this computation of net return would be more favorable to the Company than that determined in its last order because of the allowance of return on Job Development Investment Credit. The Commission allowed no return on this item of capital in its last order for this Company. We advert to these hypothetical computations to demonstrate what the Commission may have been inclined to approve absent the present state of the economy and the insufficiency of service.
PREMISES CONSIDERED __________
We are of the opinion that the existing rates and charges of Continental Telephone Company of the South — Alabama are in all respects reasonable and adequate and that the application herein should be denied."
 APPENDIX A
Determination of Test Period Rate of Return on Total Intrastate Cost Capital:
Rate of Return = Net Operating Income $2,507,457 ---------------------- = ----------- = 8.16% Intrastate Cost Capital $30,729,000
 APPENDIX B
Determination of Test Period Rate of Return on Common Equity: *Page 1363 
 Percentage* Cost Composite of total Rate Cost ---------- ---- ---------
Long term 53.00% x 6.60% = 3.50% debt Short term 9.88% x 6.75% = 0.67% debt Preferred 6.20% x 8.05% = 0.50% stock Common 30.92% x 11.29% = 3.49% equity ------ ----- 100.00% 8.16%
* Capitalization Ratios adopted in Docket 17123.
 APPENDIX C
Determination of Test Period Rate of Return on Rate Base:
Rate of Return = Net Operating Income $2,507,457 ------------------- = ---------- = 6.52% Rate Base $38,463,449
 APPENDIX D
Overall Return Requirement Necessary to Provide a hypothetical 12.50% Return to Common Equity:
 Percentage Cost Composite of total Rate Cost ---------- ---- ---------
Long term 53.00% x 6.60% = 3.50% debt Short term 9.88% x 6.75% = 0.67% debt Preferred 6.20% x 8.05% = 0.50% stock Common 30.92% x 12.50% = 3.86% equity ------ ----- 100.00% 8.53%
 APPENDIX E
Intrastate Income and Revenue Requirement to Provide a hypothetical 8.53% Return on Total Intrastate Capital:
$ 31,487,000 — Intrastate capital including JDIC x 8.53% — Return to total capital ------------- $ 2,685,841 — Income requirement — 2,507,457 — Intrastate operating income ------------- $ 178,384 — Income difference ÷ .49156511 — Retention factor ------------- $ 362,890 — Revenue difference
SUPPLEMENTAL RESPONSE OF THE ALABAMA PUBLIC SERVICE COMMISSION TO THE ORDER OF THE ALABAMA SUPREME COURT DATED MAY 31, 1978.
 CONTINENTAL TELEPHONE COMPANY OF THE SOUTH — ALABAMA DOCKET NO. 17453 Supreme Court Docket 77-515
(1) Rate Base — The rate base used in this docket was the same rate base as presented by the Company in Commission Exhibit 3, Schedule 3 (Prestwood Schedule 3) for the period ending June 30, 1977, as set out below:
Intrastate ---------- Telephone Plant in Service $43,820,210 Telephone Plant Under Construction 2,343,378 Telephone Plant Held for Future Use 3,380 ----------- Total Telephone Plant Investment $46,166,968 -----------
Less: Depreciation Reserve 9,939,236 ----------- Net Telephone Plant Investment $36,227,732
New Investment to be added 12 Months Ending June 30, 1978 $ 5,126,000
Add: Materials and Supplies 334,532 Cash Working Capital Requirement 330,227 Compensating Balance Requirement 438,642
Less: Deferred Income Taxes:
Accelerated Depreciation 3,139,853 Intercompany Profit 768,358 Cost of Removal 61,535 Investment Tax Credit 23,988 ----------- Rate Base $38,463,449 ============
 The rate of return on rate base was determined by dividing the Company's Rate Base (Exhibit 3, Schedule 3, into the Company's Net Operating Income, Commission Exhibit 8, Column 4, line 17.
 Rate of Return on Rate Base = Net Operating Income -------------------- Rate Base
 Rate of Return on Rate Base = 2,507,457 ---------- 38,463,449
 Rate of Return on Rate Base = 6.52% *Page 1364 
(2) Financial Statement showing net operating income — The Net Operating Income for the Company for the test period was taken from Commission Exhibit 8 as set out below:
Intrastate Operating Revenue Operations — --------------- ---------- Local Service Revenue $ 7,357,925 Toll Service Revenue 3,444,607 Miscellaneous 361,756 Less: Uncollectibles 42,424 ----------- Total Operating Revenue $11,121,864 ----------- Operating Expenses ------------------ Maintenance Expense $ 1,847,377 Depreciation Expense 2,427,720 Traffic Expense 369,468 Commercial Expense 729,906 General Office Salaries 
Expenses 531,057 Other Expenses 789,045 ----------- Total Operating Expense $ 6,694,573 ----------- Other Operating Taxes $ 934,616 ----------- Operating Income Before F.I.T. $ 3,492,675 ----------- Federal Income Taxes $ 1,071,379 Interest Charged to Construction 86,161 ----------- Income Available for Return $ 2,507,457 ===========
(3) The Company computed its intrastate net operating income as of June 30, 1977. Accordingly, it was necessary to determine the amount of intrastate invested capital as of the same date. The Company's rate base exhibit showed that the ratio of intrastate property to combined property was 81.22% at June 30, 1977 and was estimated to be 81.28% including the new investment to be added in the year following the end of the test period. The average of these two figures is 81.25%. Applying this percentage to the Company's capital at June 30, 1977 (shown on Commission Exhibit 5, Schedule 10, Page 2 of 2), excluding job development tax credit, shows intrastate invested capital of $3,729,000.[1] Based on a consideration of the capitalization ratios of the Company in each of the periods since 1972 and on the capitalization ratios of the parent company the Commission determined that the capitalization ratios used in its last rate proceeding involving this Company should be continued as follows: Long term debt, 53.00%; short term debt, 9.88%; preferred stock, 6.20%; and common equity, 30.92% As shown above, the Company's intrastate net operating income under existing rates was $2,507,457 at June 30, 1977. Its matching intrastate invested capital on the same date was computed to be $30,729,000. The return on invested capital was $2,507,457 divided by $30,729,000 or 8.16%. The computation of 11.29% on common equity is shown as follows:
Return on Total Intrastate Capital 8.16% Less: 53.00% Long Term Debt at 6.60% 3.50% Less: 9.88% Short Term Debt at 6.50% .67% Less: 6.20% Preferred Stock at 8.05% .50% ----- Available for Common Equity 3.49% Percentage of Common Equity 30.92% Percentage Earned on Common Equity 11.29%
(4) Cost of Debt Capital:
 Long Term — The cost of long term debt was taken from Commission Exhibit 5, Schedule 11, Page 1 of 3 (Brennan Schedule 11, Page 1 of 3) which shows the effective cost rate of long term debt to be 6.60%.
 Short Term Debt — The cost of short term debt was taken from the same exhibit as above which shows the cost to be 6.75%.
 The above figures were accepted in the same manner as presented by the Company.
(5) Cost of Equity Capital — The rate of return witness for the Company recommended a rate of return on common equity of 14.00% and the rate of return witness for the intervenor recommended a rate of return on common equity as 12.50%. The Commission recognizes that this is opinion evidence drawn from a study of factual data relating to actual returns on the equity capital of so-called comparable companies, certain marketing and bond data and the witnesses' own subjective analyses of the situation. The Commission has noted that nowhere in any of the exhibits relating to rate of returns has there *Page 1365 
been shown the rate of return earned on rate base. The returns shown are always based on invested capital and not on rate base. Since it is not possible for the Commission to determine what rates of return are earned on rate bases of other jurisdictions and companies, it is necessary to translate the allowed and reasonable rates on invested capital to a return on the property base. In summary, the Commission considered all of the factual evidence from all witnesses relating to return on common equity and, after giving some substance to the quality of service as it relates to efficiency of operation, found the rate of return of 11.29% earned on common equity under existing rates to be reasonable and just to both the utility and public for the purpose of this proceeding. It is noted that the factual data relating to the percentage return on common equity varied from a low of 7.9% to a high of 16.7%.
(6) Cost of Preferred Stock — The cost of preferred stock was taken from Commission Exhibit 5, Schedule 12, Page 1 of 2 (Brennan Schedule 12, Page 1 of 2) which gives the cost of preferred stock at June 30, 1977. This cost was 8.05%. We accepted this figure as the Company presented it.
Briefly stated, the Company asserts that the Commission has determined that the Company is earning 8.16% on an intrastate capital figure and 11.29% on common equity by using hypothetical calculations and evidence that is unsupported in the record. The Commission acknowledges that these returns are on the low end of the zone of reasonableness, but it asserts that the figures are both correct and justified.
The Company maintains that the APSC erred in:
 1. adjusting the capital figures ($37,819,000) by 81.25% to reach the "intrastate invested capital" figure ($30,729,000);
2. using the capitalization ratios of the Company in
 the last rate proceeding instead of the capitalization ratios of the Company as of June 30, 1977, the end of the test year; and
 3. excluding the job development tax credit from the computation of the total intrastate capital figure.
We will treat items one and two above together, as they are integral components of the rate of return calculation.
The Company presented evidence showing that as of June 30, 1977, the Company's capital ratio was:
 Long Term Debt 51.6% Short Term Debt 3.1% Preferred Stock 6.50% Common Equity 38.80%
In Appendix B of the Commissioners' concurring opinion and Paragraph 3 of the Commission's response, the APSC adopts a capital ratio of the Company as of September 30, 1975:
 Long Term Debt 53.00% Short Term Debt 9.88% Preferred Stock 6.20% Common Equity 30.92%
This ratio is the capital ratio submitted by the Company and used by the Commission in the Company's last rate proceeding, Docket No. 17123.
The record does not disclose any evidence impugning the integrity of the Company's figures with respect to capitalization during the test period. As a matter of fact, the APSC appears to have relied on these capitalization figures to a certain extent, since the capital figures used to reach the "intrastate invested capital" figure in this proceeding is reflected on the same exhibit that presents the Company's current capital ratio. Absent some evidence indicating that the Company's figures are unreliable, misstated, or otherwise misleading, the Commission should not completely ignore these figures.
While the intervenors' expert witness, Dr. Matityahu Marcus, testified that the appropriate capital ratio for this proceeding was the capital ratio of the Company's parent corporation, Continental Telephone Corporation, his testimony was not directed at the *Page 1366 
impropriety per se of the Company's capital ratios during the test period. Dr. Marcus testified that because the Company was a wholly-owned subsidiary, the parent corporation's ability to alter the Company's capital structure indicated that the parent's capital ratio was more suitable. He did not testify that the Company's test year capital structure was contrived or deliberately misleading; he merely indicated that, in his opinion, the parent's capital structure was more appropriate.
Despite the intervenors' earnest attempt to characterize the Company's capital figures as "hypothetical," the APSC obviously considered the Company's figures as legitimate in the previous rate proceeding, Docket No. 17123, since it applied those figures in that case as well as the present case.
This Court has held that it is incorrect to select a temporarily distorted capital structure as the basis for calculation in a rate proceeding. Alabama Public ServiceCommission v. Southern Bell T. T. Co., 253 Ala. 1,42 So.2d 655 (1949). It is also incorrect to arbitrarily disregard capital ratios absent some showing in the record that the ratios are temporarily distorted, deliberately misstated, or otherwise unreliable. We do not believe that there has been such a showing in this case.
It is readily apparent that the APSC, in determining a reasonable rate of return on the statutory rate base
($38,463,449), has taken the Company's invested capital figure
($37,819,000), which represents invested capital for bothinterstate and intrastate operations, adjusted that total invested capital figure to find an intrastate invested capital figure of $30,719,000. The Commission then gives rather strict mathematical significance to the rate of return to equity, using this intrastate invested capital figure of $30,719,000. In Alabama Public Service Commission v. South Central Bell,348 So.2d 443 (Ala. 1977), the Court held: "This rate of return [on the company's equity investment] is an essential consideration under the `cost of capital' theory but it is not to be givenstrict mathematical significance under the rate base theory."
(Emphasis added). In several recent rate cases, this Court has been called upon to decide a confiscation question where a rateof return to equity has been considered of prime significance by the litigants. The problem generally arises because in Alabama the statutory rate base will usually be a higher figure than the invested capital figure, especially if the Company is increasing its capital, or is allowed to include in its statutory rate base "new investment." Consequently, opponents of rate increases have consistently argued that rate of return to equity should be based solely upon the Company's equityinvestment during the test year. The utilities, on the other hand, argue that the rate of return to equity should be based at least upon that percentage of the entire statutory rate base
that is applicable to the percentage of equity investment. In short, the utilities generally argue that the debt-equity ratios should be projected and applied to any new and additional capital which will be added, and which is included in the statutory rate base. As this Court has said on more than one occasion: "The ultimate question of a fair rate of return should not be a composite of the results mechanically reached by these formulae, with little regard given to the question sought to be determined, that is, the fair rate of return."State v. Southern Bell Telephone and Telegraph Co., 274 Ala. 288, 148 So.2d 229 (1962); Alabama Public Service Commission v.South Central Bell, 348 So.2d 443-448 (Ala. 1977).
Mathematical computations of the rate of return to equity portion (actual and projected) of the statutory rate base are helpful in determining a fair rate of return on the rate base, but, in Alabama, these computations are not to be given "strict mathematical significance." Alabama Public Service Commissionv. South Central Bell, supra.
In this proceeding, the APSC, by using the adjusted invested capital figure to determine mathematically the rate of return to equity has allowed only a 6.52 percent return on the rate base computed as follows: *Page 1367 
Net Operating Income $2,507,457 -------------------- Statutory Rate Base ---------- = 6.52% $38,463,449
It is undisputed that the intrastate rate base represented that portion of the Company's combined assets devoted to intrastate service.
 Combined Intrastate -------- ----------
Telephone Plant in Service $53,961,380 $43,820,210
Telephone Plant Under Construction 2,892,702 2,343,378
Telephone Plant Held for Future Use 4,188 3,380 ----------- ---------- Total Telephone Plant Investment $56,858,270 $46,166,968 ----------- ----------- Less: Depreciation Reserve 12,255,455 9,939,236 ----------- ----------- Net Telephone Plant Investment $44,602,815 $36,227,732 ----------- ----------- New Investment to be added 12 Months Ending June 30, 1978 $ 6,310,000 $ 5,126,000
Add: Materials and Supplies 412,442 334,532 Cash Working Capital Requirement 406,595 330,277 Compensating Balance Requirement 540,000 438,642
Less: Deferred Income Taxes: Accelerated Depreciation 3,891,736 3,139,853 Intercompany Profit 952,352 768,358 Cost of Removal 76,270 61,535 Investment Tax Credit 29,734 23,988 --------- ---------- Rate Base $47,321,760 $38,463,449 =========== ===========
The Commission acknowledges that the $38,463,499 figure represents the statutory intrastate rate base computed in accordance with Code 1975, § 37-1-80.[2] These computations have been examined and approved by this Court. See e.g., AlabamaPublic Serv. Com'n v. South Central Bell, supra.
In Alabama Power Co. v. Alabama Public Serv. Com'n,359 So.2d 776 (Ala. 1978), this Court made the following observation:
 The Company's rate base was adopted by the Commission without any opposition from intervenors. Using that rate base, the Commission found that 6.37% is a fair and reasonable rate of return on the statutory rate base. This was computed by dividing the earnings requirement (found by the Commission to be $173,237,375) by the rate base ($173,237,375 ÷
$2.7 billion). In General Telephone Co. of the Southeast, [335 So.2d 151 (Ala. 1976)], an argument between the parties was whether a 7.36% return on rate base would result in an 11.05% return on equity.
[Emphasis added.]
359 So.2d at 779. Accord, Alabama Public Serv. Com'n v. SouthCentral Bell, supra.
As we have noted, if the net operating income in this case, $2,507,457 is divided by the rate base, $38,463,449, the rate of return on the statutory rate base is 6.52%. In this case, as in the General Telephone Co. of the Southeast case, supra, the issue is whether a certain return on the rate base results in a certain return on equity. The APSC contends that the 8.16% return on an "Intrastate Cost Capital" figure results in an 11.29% return on presumably, "intrastate invested equity"; however, it is conceded that only 6.52% is being returned on the statutory rate base.
The APSC derived the "intrastate invested capital" figure by multiplying the Company's capital, (excluding job development tax credit) $37,819,000 by 81.25%, the approximate ratio of the intrastate rate base to the combined rate base. The original capital figure, $37,819,000, is clearly denominated Capital Structure and Related Ratios Based on Investor Provided Capital for "Continental Telephone of the South-Alabama Operations." (Brennan Exhibit 5, Schedule 10.) By adjusting the investor provided capital figure of $37,819,000 for Continental's "Alabama operations" the APSC has admittedly based its calculation on a rate of return to equity on "intrastate invested capital of $30,729,000," instead of on the "reasonable value of [Continental's] property devoted to the public service." *Page 1368 
Code 1975, § 37-1-80. By using the total investor supplied capital ($37,819,000), and adjusting this total downward to get the intrastate investor supplied capital ($30,719,000), the APSC has not allowed any rate of return to equity on thestatutory intrastate rate base which is in excess of investor supplied intrastate capital of $30,719,000.
The statutory rate base is the value of the property used by the utility for public service and the rate of return of 6.52% on this statutory rate base is not reasonable and is insufficient to yield a fair rate of return under the criteria set out in Alabama Public Service Commission v. South CentralBell, 348 So.2d 443, 445-446.
In this Company's prior rate proceeding (Docket No. 17123), the APSC approved a 7.44% return on the Company's statutory rate base and a correlative 12.5% return to common equity. In this proceeding (Docket No. 17453), the APSC has only allowed a 6.52% rate of return on the Company's statutory rate base. We appreciate the concern of the APSC with regard to "the present state of the economy and the insufficiency of service," but on this record, we believe that to continue the rates prescribed in Docket No. 17123 is confiscatory.
We do not hold that the rate of return to equity must necessarily be based upon the statutory intrastate rate base. We do hold that the fair rate of return must be based upon a fair and adequate rate base which at the time the rates were determined in this proceeding included new investment. As we have previously noted, rate of return to equity is one method which may be used in determining a fair rate of return on the reasonable value of the utility's property devoted to public service, but it should not be given strict mathematical significance. We also call the Commission's attention to the following requirement of the law. Code 1975, § 37-1-80
provides, in part:
 In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service.
While the Commission alluded to inadequacy of service in certain areas, we note there was no finding of improper management of the Company. Improper management may always be considered by the Commission in determining a fair rate of return.
The final contention raised on this appeal is the exclusion of the job development tax credit from the computation of the common equity total. This issue has proved troublesome in the past, see Gen. Telephone Co. of S.E. v. Alabama Public ServiceCommission, 335 So.2d 151, 161 (Ala. 1976) (Bloodworth, J., dissenting), and the position of the Commission is ambivalent. This Court has recognized that the APSC apparently contends that this credit is not equity, Alabama Public Service Com'n v.South Central Bell, 348 So.2d 443, 453 (Ala. 1977) (Maddox, J., dissenting), but in the concurring opinion of Commissioners Whatley and McDaniel in this case, there appears to be at least a possibility of including this credit for rate-making purposes. (See concurring opinion and Appendix E, supra.)
The Company presented evidence in this proceeding which tended to indicate that if the job development tax credit is not included in the rate base for rate-making purposes, the Internal Revenue Service disallows the credit altogether. However, it appears that the actions of the I.R.S. are contingent upon certain Company elections under § 46 (f) of the Internal Revenue Code.
Suffice it to say that the record is not clear as to the degree of the Company's compliance with these election requirements. Given the state of the record and the lack of a definitive ruling by the APSC and the reasons therefor, we do not consider it appropriate to determine, as a matter of *Page 1369 
law, whether the job development tax credit was improperly excluded in this case.
Since we have determined that the APSC erred in several respects, this cause must be remanded for further proceedings in accordance with this opinion.
We remand this case to the Commission to fix a rate of return which is not confiscatory. Supersedeas will remain in effect.
APPLICATION FOR REHEARING IS OVERRULED; OPINION SUBSTITUTED; REVERSED AND REMANDED.
All of the Justices concur.
[1] This figure is conceded to be a typographical error and should read $30,729,000.
[2] Any reference to this Code section is prior to the 1978 Amendment.