427 So.2d 981 (1982)
CONTINENTAL TELEPHONE COMPANY OF THE SOUTH
v.
ALABAMA PUBLIC SERVICE COMMISSION; Billy Joe Camp, as its President, Lynn Greer, Associate Commissioner, and Jim Folsom, Jr., Associate Commissioner.
81-528.
Supreme Court of Alabama.
December 22, 1982.
Rehearing Denied February 11, 1983.
*983 John E. Grenier and L. Burton Barnes, III, of Lange, Simpson, Robinson & Somerville, Birmingham, for appellant.
Euel A. Screws, Jr. and James M. Edwards of Copeland, Franco, Screws & Gill, Montgomery, for appellee Alabama Public Service Com'n.
Mark D. Wilkerson, Montgomery, for appellee Public Staff.
Charles A. Graddick, Atty. Gen., and Thomas F. Parker, IV, Wendell Cauley, and Charles A. Guyton, Asst. Attys. Gen., for appellee Atty. Gen.
MADDOX, Justice.
This is an appeal by Continental Telephone Company of the South, pursuant to Code of 1975, § 37-1-140, of the February 26, 1982, order of the Alabama Public Service Commission.
On July 31, 1981, Continental filed a schedule of new rates and charges for intrastate service with the Commission. The proposed schedule of rates, based on the test year ending March 31, 1981, had an effective date of August 30, 1981, and was structured to increase Continental's annual intrastate revenue for Alabama operations by $5,668,577. On August 13, 1981, the Commission suspended the proposed rates through February 28, 1982, pending an evaluation of the rates. The Office of the Attorney General filed a notice of intervention and the "Public Staff" was allowed to appear in the proceedings representing the consumer interest.
Following the proceedings, the Commission issued its order which concluded that the rates structured to increase Continental's revenue by $5,668,577 were excessive. The Commission also found that a 9.01% overall cost of capital was a fair rate of return to be applied to a jurisdictional intrastate rate base of $61,258,000 resulting in a 16% return to equity for the parent company of Continental. Consequently, *984 Continental was ordered to file rates structured to produce additional revenue of only $1,638,000. In its order, the Commission made what it considered to be "pragmatic adjustments" in Continental's capital structure, rate base and operating income. Continental claims that these adjustments amount to confiscation and that the Commission violated its appearance and representation rule and the ex parte communications rule. Thus, the two primary issues of this case are: whether the adjustments made to Continental's rate base, capital structure and operating income deny Continental a just and reasonable rate of return, thereby making the Commission's order confiscatory; and whether the Commission violated its rule of appearance and representation, and the ex parte communications rule.
On March 25, 1982, pursuant to §§ 37-1-125, -127, -128, -129 and -141, Continental filed an application for supersedeas alleging confiscation. On July 23, 1982, in accordance with § 37-1-141, the Court granted supersedeas permitting Continental to charge and collect $2,000,000 pending the disposition of this appeal. This amount was in addition to the amount granted by the Commission in its February 26, 1982, order.

I

Scope of Review
The role of this Court in rate cases is clearly delineated and well documented. As the Court observed in City of Birmingham v. Southern Bell Tel. & Tel. Co., 234 Ala. 526, 176 So. 301 (1927):
"The Legislature may fix the rates or it may empower an agency, such as the Public Service Commission, to act in its stead in this regard. In either event, the courts are open for one who complains that by the exercise of the rate-making power he has been deprived of property without due process of law or that his private property has been taken for public use without just compensation. The courts act, therefore, for the purpose of holding the exercise of this legislative power within constitutional limits (Const. 1901,§§ 13, 23), but not for the purpose of making rates or substituting their judgment for that of the legislative agencies."
234 Ala. at 531, 176 So. at 305. Stated succinctly, "this Court neither makes the rates, nor substitutes its judgment for that of the legislative agency fixing rates." Alabama Power Company v. Alabama Pub. Serv. Com'n., 359 So.2d 776, 778 (Ala.1978). But, when the matter of confiscation is raised, this Court must ensure that the fundamental requirements of due process under the United States Constitution and the Alabama Constitution are not violated. U.S. Constitution Amendment XIV; Alabama Constitution, Art. 1, §§ 13 and 23.
Traditionally, when confiscation has been alleged in the context of public utility rate cases, the Court has operated under a broad scope of review and exercised its independent judgment as to the law and facts involved rather than presuming the Commission order to be valid or reasonable. See e.g., Continental Tel. Co. v. Alabama Pub. Serv. Com'n, 376 So.2d 1358 (Ala. 1979); Alabama Power Co. v. Alabama Pub. Serv. Com'n., 359 So.2d 776 (Ala.1978); General Tel. Co. of the Southeast v. Alabama Pub. Serv. Com'n., 335 So.2d 151 (Ala. 1976). In Alabama Gas Corp. v. Alabama Pub. Serv. Com'n 425 So.2d 430 (Ala.1982), we have modified this previous standard of review. The applicable portion of that opinion is recited here:
"Similarly, § 37-1-124, Code 1975, prescribes that the Commission's order shall be taken as prima facie just and reasonable and that this court shall set aside the order only if it finds that:
"(1) The Commission erred to the prejudice of appellant's substantial rights in its application of the law; or
"(2) The order, decision or award was procured by fraud or was based upon a finding of facts contrary to the substantial weight of the evidence.
"Using the broad scope of review when confiscation is merely alleged has rendered *985 this code section almost meaningless.
"We hold that the Company has the burden of clearly establishing from the record that the Commission's order is confiscatory in order to invoke this Court's independent review.
"In St. Joseph Stock Yards Company v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936), Chief Justice Hughes, writing for the Court states:
"`The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. (Citations omitted.) (at 53).'
"We agree with Chief Justice Hughes that confiscation must be clearly established by the complaining party in order to invoke a broader scope of review in utility rate cases. With this case we prospectively adopt the stricter standard, i.e., that confiscation must be clearly established by the utility in order to invoke the broader scope of review. (Emphasis added.)
Alabama Gas Corp., Id.
While we have on many occasions articulated the controlling legal principles used in determining what constitutes a fair rate of return in order to avoid confiscation, see, e.g., Alabama Power Co. v. Alabama Pub. Serv. Com'n., 390 So.2d 1017 (Ala. 1980); Continental Tel. Co. v. Alabama Pub. Serv. Com'n., 376 So.2d 1358 (Ala. 1979); Alabama Pub. Serv. Com'n. v. Southern Bell Tel. & Tel. Co., 253 Ala. 1, 42 So.2d 655 (1949), we have likewise noted:

"The figure arrived at as operating income and the figure arrived at as the statutory rate base are as significant elements in determining a fair rate of return as is the amount of return on common equity; none of these figures can be ascertained with mathematical certainty because such includes judgmental values." (Emphasis added.)
Alabama Power Co. v. Alabama Pub. Serv. Com'n., 390 So.2d at 1026. Therefore, we must necessarily consider these elements because of their impact on the rate of return.
From our review of this case, we have determined that some of the adjustments made by the Commission to Continental's rate base, capital structure and operating income are not supported by legal evidence of substantial weight and probative force adduced at the hearing and, therefore, are confiscatory. In order to rectify these confiscatory adjustments, we remand this case to the Commission for proceedings consistent with our findings below. See Code 1975, § 37-1-124; see also, Alabama Pub. Serv. Com'n. v. Southern Bell Tel. & Tel. Co., 253 Ala. 1, 42 So.2d 655 (1949).

II

The Uniform Standard of Accounts
One of the primary points of contention in this case is the treatment to be accorded the Uniform Standard of Accounts (USOA) as prescribed by the Federal Communications Commission (FCC). See, 47 C.F.R. §§ 31.01-1 through 31.8 (1981). In brief, the Commission cites the following list of authorities from other jurisdictions which suggest that the USOA in no way binds a regulatory commission in rate proceedings. Pennsylvania Power & Light Co. v. Pennsylvania Pub. Util. Com'n., 10 Pa. Commw. 328, 311 A.2d 151 (1973); Re: Lexington Water Company, 72 PUR 3d 253, 260 (Ky.P.S.C., 1968); Re: Northwestern Bell Telephone Co., 18 Pub.Util.Rep. (NS) 460 (Minn.R. & W.C., 1927); Customers v. New York & Richmond Gas Co., 48 Pub.Util.Rep. (NS) 25 (N.Y.P.S.C.1943); Re: The Montana Power Co., 42 Pub.Util.Rep.3d 241, 253 (Mont.P.S.C.1962). Indeed, the Commission insists, along with the "Public Staff," that the USOA is merely a system of notation. The thrust of the Commission's argument is that it must maintain the independence to make "pragmatic adjustments" as called for by the individual circumstances of each rate case. In brief, the Public Staff contends *986 that "[w]hile the Commission indisputably adopted a uniform system of accounts in Alabama, there exists no statute, regulation or order which limits the Commission's latitude to treat certain items differently for rate making purposes." We agree that the Commission has the power to prescribe rates dependent upon the individual circumstances of each case; but the Commission should follow the rules it has adopted governing how certain items should be treated. Section 37-1-54 reads:
"(a) The commission may, when it deems it advisable to do so, establish a uniform system of accounts for each utility, which system shall be uniform for all utilities of the same kind and class, and may make such regulations regarding the accounts and statistics of each utility for the purpose of insuring uniform and correct books of account and record as in the judgment of the commission may be necessary to carry out any of the provisions of this title.
"(b) Every utility shall keep its books, papers and records accurately and faithfully according to the system of accounts and regulations prescribed by the commission, and shall comply with all reasonable directions of the commission relating thereto."
Section 37-1-54(a) grants the Commission the authority to "establish a uniform system of accounts." General Tel. Co. of the Southeast v. Alabama Pub. Serv. Com'n., 424 So.2d 1288 (Ala.1982). The Public Staff, in its brief, states that "[i]n 1968, in Docket 15957, the Commission adopted its general rules and regulations governing uniform systems of accounting and reporting for utilities. These rules included a reference adopting the Federal Communications Commission's Uniform System of Accounts". (Emphasis added.) Because the Commission adopted the USOA, it should follow those rules. In General Tel. Co. of the Southeast v. Alabama Pub. Serv. Com'n., supra, this Court opined:
"... Code 1975, 37-1-54, gives the APSC the authority to establish a uniform system of accounts. The APSC exercised this statutorily delegated power by the adoption of Section 3(c) of its rules and regulations, wherein it adopted the FCC Uniform System of Accounts. Thus, unless the APSC affirmatively modifies its rules regarding the FCC Uniform System of Accounts, it must allow utilities to use the rules, including amendments. The purpose of the rules is to provide uniformity and thus provide consistent accounting procedure. The APSC should respect the amendments or modify its rules accordingly. ..."
424 So.2d 1288 (Ala.1982).

III

Rate Base Adjustments

A. Telephone Plant Under Construction.
We now concentrate on the adjustments to rate base as discussed by Continental in its brief. Section 37-1-80 provides:
"The rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. For the purpose of fixing rates, such reasonable value of a public utility's property shall be deemed to be the original cost thereof, less the accrued depreciation, as of the most recent date available. In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration among other things to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served *987 thereby with adequate service." (Emphasis added.)
The determination of rate base as set forth in this statute is a two step analysis; first, the items of property to be included in rate base, and, second, the valuation of these items. As we pointed out in State v. Alabama Pub. Serv. Com'n., 293 Ala. 553, 307 So.2d 521 (1975):
"The ultimate question in a rate case is a fair rate of return from a predetermined rate base. Various formulae and complicated calculations have been developed by experts in the field of rate making in determining first, a reasonable rate base, and second, a fair rate of return on such reasonable rate base."
293 Ala. at 561, 307 So.2d at 527. A reasonable rate base consists of the "reasonable value of its property devoted to the public service." All utility property used to serve the public, therefore, is to be included in computing a utility's rate base.
Telephone Plant Under Construction (TPUC) is a proper rate base item, Alabama Pub. Serv. Com'n. v. Southern Bell Tel. & Tel. Co., 253 Ala. at 22, 42 So.2d at 673 (hereinafter Southern Bell) Continental charges that the Commission has improperly subtracted accounts payable from TPUC and presented this stripped account as a rate base item. The expert testifying on behalf of the Commission stated that accounts payable represented zero cost, noninvestor supplied funds on which the investor should not be allowed any return. The USOA, specifically 47 C.F.R. § 31.100:2(a), does not make any adjustment for accounts payable. 47 C.F.R. § 31.100:2(a) reads:
"This account shall include the original cost of construction of telephone plant, other than station apparatus and station connections, that is not completed ready for service. It shall include interest during construction, as provided for in paragraph (d) of this section, taxes during construction, and all other elements of cost of such construction work."
Therefore, the amount attributed to accounts payable and removed by the Commission should be restored to Continental's rate base, unless the Commission has allowed the company "the right to assign an earning rate through the capitalization of interest during construction." Southern Bell, 253 Ala. at 22, 42 So.2d at 673.

B. Materials and Supplies
The Commission reduced this item as originally included in Continental's rate base by the accounts payable. The Commission found $103,494, not $578,994 as requested by Continental, as the amount to be included in rate base and afforded a fair rate of return. In State v. Alabama Pub. Serv. Com'n., 293 Ala. 553, 572, 307 So.2d 521, 538 (1975), this Court concluded that materials and supplies are properly includable in rate base. Here, the Commission maintains this source of funds is provided to Continental at no cost and therefore should require no return. Section 37-1-80, however, requires that "[e]very utility shall be entitled to earn a fair net return on the reasonable value of its property devoted to public service." (Emphasis added). Note A to 47 C.F.R. § 31.122, regarding material and supplies, reads: "This account shall not include amounts representing the cost of material or articles, title to which is not vested in the company." Of the $475,000 adjustment to rate base deleting accounts payable, the uncontroverted evidence indicated that all but $89,000 of the materials and supplies had been received by Continental. All materials and supplies should be included in its rate base, unless, on remand, the Commission specifically finds that title to the materials and supplies, including those in transit, is not vested in the company.

C. Aerial Wire
A major adjustment in the Commission's order in this case was the removal from rate base of $1,200,000 in unrecovered investment associated with Continental's aerial wire account. The aerial wire account, at the end of the test year, carried a debit balance of $1,200,000, indicating that retirements of aerial wire exceeded the amounts credited to the depreciation reserve by the *988 amount of the balance. The Commission reduced Continental's rate base by charging off $600,000, and by transferring another $600,000 to the Extraordinary Maintenance and Retirement Account. The amount transferred is to be amortized by equal charges over a 10-year period to the Extraordinary Retirement Account. This adjustment was made for both book and cost-ofservices purposes in the rate case proceedings.
The Commission stated in its order that it found from the evidence that Continental had "displayed little diligence in managing this depreciation account in any sort of realistic manner." Further, the Commission said that Continental "should have realized for at least fifteen years that this type of plant was obsolete, and should have provided a reserve for its imminent retirement." Both the Commission and the "Public Staff" in brief contend that the underaccrual of aerial wire resulting from Continental's failure to inventory property as it acquired smaller telephone companies and its failure to properly record the credit to the depreciation reserve account, constitute mismanagement on Continental's part.
Continental asserts that in the Commission's Report and Order of February 27, 1980, Docket 17968, the Commission pressured the company to eliminate all open wire at a more rapid rate than management might have otherwise elected. Continental contends the Commission's order, relative to the elimination of aerial wire, was impermissible interference with managerial prerogatives. The "Public Staff", in brief, addresses the aerial wire issue as follows:
"Had [Continental] exercised efficient and economic management, it would have adjusted its depreciation rates to reflect the obvious decline of its aerial wire account. Although the Company correctly points to a few instances in which it adjusted its depreciation rate slightly, the fact remains that the Commission granted every hike in depreciation rates requested by the Company. It would be totally inequitable to saddle today's customers with expenses caused by poor management foresight occurring over the last fifteen years."
While the Commission should not be allowed to interfere with the proper operation of a utility as a business concern by usurping managerial prerogatives, Alabama Power Co. v. Alabama Pub. Serv. Com'n., 359 So.2d 776, 780 (Ala.1978), the Commission is nevertheless required to grant only those rates consistent with good management practices. Section 37-1-80 provides in pertinent part:
"... Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. ..." (Emphasis added.)
See also, Continental Telephone Co. v. Alabama Pub. Serv. Com'n., 376 So.2d 1358, 1368 (Ala.1979). This Court is inclined to agree with the Commission's treatment of aerial wire. Thus, we hold that under the evidence the Commission did not err in making the aerial wire adjustment.

D. Station Apparatus Inventory Adjustment
During the test period, Continental wrote off $1,999,366 of its station apparatus in its Alabama operations. This amounted to approximately 27% of its investment in station apparatus. The Commission removed $999,683 of this amount from Continental's rate base and placed it in the Extraordinary Income Charges Account. Likewise, the Commission ordered that an additional $999,683 be taken from rate base and charged to the Extraordinary Maintenance and Retirements account and amortized over a longer period. The Commission's adjustment to station apparatus inventory resulted in a reduction to Continental's rate base of $1,583,298.
Continental maintains that its treatment of this transaction complies with Note E of C.F.R. § 31.231 of FCC's USOA. Note E provides:

*989 "An annual inventory shall be taken of all telephones in stock that are included in this account. The number of such telephones as determined by this inventory, together with the number of all other telephones included in this account, shall be compared with the corresponding number of telephones as shown by the respective control records. The original cost of any unreconciled differences thereby disclosed shall be adjusted through account 171 `Depreciation reserve.' Appropriate verifications shall also be made at suitable intervals and necessary adjustments between this account and account 171 shall be made for all other station apparatus included in this account."
Although testimony indicated that Continental implemented, in 1973, a monthly procedure of telephones in stock, Continental did not actually take an inventory of telephones in service (a station apparatus field inventory) until April 1979. A Commission witness testified that this was a procedure (Practice F1-911-251-014) South Central Bell had complied with since 1957. The Commission stated in its order:
"The resulting adjustment of $1,999,366 seems to represent, almost completely, station apparatus units lost in prior years. This conclusion is supported by the retirement results shown on Page 25 of Exhibit 11, which shows that the total retirements of this account for 1979, of which 96% represented this adjustment, amounted to $2,093,412, as compared to corresponding results for 1978, 1977 and 1976 of $201,131, $272,428 and $61,591, respectively.
"Because of the lack of adherence to this field inventory requirement [the chief of the auditing section of the Public Staff] further contended, the Company was unaware of its true retirement experience in this area, and hence did not provide a sufficient amount in the depreciation reserve to absorb this loss."
This was plainly not an ordinary write-off. Nonetheless, Continental contends there was not one charge that any person in the company lost or stole the equipment and that in taking the inventory and in the subsequent accounting treatment of the shortages it uncovered, it was acting to properly assess its plant and to properly account for it. We disagree with Continental and agree with the Commission. There was sufficient evidence for treating this uncharacteristically large write-off as an extraordinary item, thus increasing the depreciation reserve by the entire amount, as well as charging the write-off against Extraordinary Income Charges. Continental should not be entitled to earn a return on station apparatus no longer in service and on which it has failed to keep appropriate internal controls. Although Continental has likely recovered a portion of the cost of this property through cost of service, present and future ratepayers, by the terms of § 37-1-80, cannot be required to pay rates on property no longer devoted to public service.

E. Depreciation Reserve
The Commission decreased Continental's rate base by $785,000 with an adjustment to the depreciation reserve account. At the hearing it was pointed out that Continental had made a substantial, upward adjustment to its depreciation expense. Although this was a pro forma adjustment to bring the expense level to the end of the period and was not in recognition of the depreciation experienced during the test year, Continental did not make a concomitant adjustment to its depreciation reserve.
The expert witness appearing on behalf of the Attorney General recommended that depreciation reserve be adjusted to match Continental's recognition of depreciation expense. He testified:
"Obviously, if the depreciation expenses during the test year have been that much higher, then the reserve as of the end of the test year would have been higher by the account ... the year end depreciation reserve should be adjusted to reflect the proposed adjustment to depreciation expense."
Accordingly, the Commission found:
"To allow [the Company's] treatment would mean that the ratepayer would be *990 required to pay for the depreciation of plant via cost of service, and simultaneously pay a return on this same plant, that by virtue of the fact it is depreciated, is not devoted to public service, and thus, should not receive a return."
In State ex rel. Utilities Commission v. Duke Power Co., 305 N.C. 1, 287 S.E.2d 786 (1982), the North Carolina Supreme Court addressed this very issue:
"In reducing Duke's rate base by the addition to the accumulated depreciation account of $3,879,000 the Commission acted within its statutory power. To have allowed Duke to claim a $3,879,000 increase in depreciation expenses in its rates and not have required an offsetting adjustment to accumulated depreciation expense would have in effect resulted in a windfall to Duke and a penalty to its customers. If we followed the narrow interpretation of the statute suggested by Duke, the effect would be to annualize one factor and not the other. This was one of the `other material facts' which the Commission is required by G.S. § 62-133(d) to consider in determining `what are reasonable and just rates.'"
287 S.E.2d at 797.
Likewise, the Supreme Court of Arkansas has approved this type of adjustment, stating that:
"The test year selected for the rate calculations was 1974. The Commission allowed annualized depreciation of $255,795 as an operating expense for the year, and, as a balancing item, added that amount to the depreciation reserve as of the end of the test year, thereby decreasing the rate base by the same amount. Arkansas Western accepts the figure $255,795 as a correct expense allowance, but it insists that the Commission should not have made a like addition to the depreciation reserve.
"It is plain enough that if a certain amount of depreciation is allowed as an operating expense of the utility company, then a like amount must eventually be deducted from the rate base. Otherwise, the ratepayers would pay for the same item twice, once as an operating expense and a second time as a return on plant value which had not been correspondingly reduced to reflect the depreciation. The problem is essentially one of accounting, for the test year is admittedly a fictitious one in which no revenue is actually received nor any expenses incurred."
Arkansas Western Gas Co. v. Arkansas Public Service Commission, 266 Ark. 668, 588 S.W.2d 424, 426 (1979).
Therefore, the Court finds the Commission's adjustment to depreciation reserve to be reasonable and consistent with the evidence in this case.

IV. Adjustments to Operating Income

A. Wage and Salary Adjustments
The Commission disallowed Continental's wage increases occurring six months or more after the end of the test year. This adjustment increased operating income, after taxes, by $108,000. Of the wage increases: one was a management increase to take effect in January 1982, the other an employee increase pursuant to a union labor contract to take effect in June 1982, and the final increase is a management increase scheduled for January 1983. In Alabama Gas Corp. v. Alabama Pub. Serv. Com'n., 425 So.2d 430 (1982), this Court specifically addressed the issue of adjustments to test year expenses for charges occurring more than six months after the end of the test year. In that case we held:
"While the circumstances of each case may vary that requires a flexible rule, under the facts of this case, the six month post test period is arbitrary and capricious. We therefore hold that the Commission's order setting a six month post test period is unreasonable under the facts of this case."
Alabama Gas Corp., Id. We do not consider these wage expenses to be remote; instead they are sufficiently known and measureable to be included in the test year in order to more accurately reflect the financial future of the company. Indeed, as this Court *991 has noted previously, "if rates are prospective, they must correspond to the actual needs of the company during the time they are in effect." Alabama Power Co. v. Alabama Pub. Serv. Com'n., 422 So.2d 767 (Ala.1982).

B. Productivity Adjustment
An $18,000 adjustment to Continental's operating income was made because of a productivity offset to the Company's post-test year wages. At the hearing, Continental challenged the use of the Bureau of Labor Statistics productivity statistics, which do not include data for Continental's Alabama operations, as being heavily skewed toward the Bell System. The Commission noted that in its last rate case, Continental presented no study to prove the proposed adjustment was widely biased toward Bell companies or any evidence that the alleged bias would be detrimental to Continental. In this case, Continental has likewise failed to produce statistical evidence to contradict this adjustment; therefore, we hold that the Commission's productivity adjustment was proper.

C. Remaining Life Depreciation
With regard to depreciation, Continental filed a depreciation study for plant in service on December 31, 1980, supporting proposed changes in the Commission's depreciation practices and rates. The study consisted of proposed remaining life rates as derived from the currently prescribed life and salvage parameters for all but four accounts. Remaining life rates for station apparatus, station apparatus-mobile and large PABX were based on revised life and salvage parameters. The study also proposed changes in the method of accounting for station connections.
It is agreed by all parties that the whole life method of depreciation is currently applied to all utilities operating in Alabama. We refuse to mandate that the Commission utilize the particular accounting method suggested by Continental rather than the one presently used.

D. Station Connections
In its February 26, 1982 order, the Commission provides "that the accounting change to allow the expensing of station connections (inside wiring) is denied until such time as generic hearing can be conducted and a statewide policy be established by the Commission." Continental argues in brief that the FCC-USOA, 47 C.F.R. § 31.232, definitively addresses the accounting for the expensing of station connections and therefore Continental's station connections should be accorded this treatment.
The USOA's accounting treatment of station connections was modified as recently as March 31, 1981, to permit station connections treatment as an expense item as opposed to its previous treatment as a capital item. We agree with Continental; the Commission should have allowed expensing of station connections consistent with the recent amendment of the USOA. General Tel. Co. of the Southeast v. Alabama Pub. Serv. Com'n, 424 So.2d 1288 (Ala.1982).

E. Rate Case Expense
The Commission denied certain rate case expenses which amount to $28,000 a year in imputed extra income to Continental. The Commission found $35,302 in legal fees associated with appearances before the Montgomery County Grand Jury, should be allowed since there was no criminal prosecution as a result of that investigation. The Commission further found that a civil suit settlement should be allowed as a legal expense that is essentially beyond the control of management and because it can be reasonably expected to recur. In its prior rate case, Continental proposed to eliminate expenses applicable to an earlier rate case, and divided in half the total estimated cost of the then current rate case to reflect a two-year amortization period. Although the Commission accepted that methodology, Continental has not followed that procedure here.
*992 An audit of Continental by the Public Staff showed $167,250 expensed during the test year. This amount included $28,505 applicable to a previous rate case and $7,082 of special local expense. Moreover, in answer to a data request, Continental responded that rate case expense recorded in the current test year was $131,662 as of March 31, 1981. The Commission ordered that the same formula used by Continental in the last rate case was fair and should be applied in this case. The Commission did not err in the treatment of this rate case expense item.

V. Capital Structure and Double Leverage

A. Capital Structure
The capital structure submitted as direct evidence by Continental reflected its capitalization for the end of the test period, March 31, 1981, but included projected changes between the end of the test period and December 31, 1981.

 Continental-Alabama's Capital Structure
 As of March 31, 1981
Capital Amount Ratio
Long Term Debt $34,807,930 53.43%
Preferred Stock 2,265,000 3.48%
Common Stock 28,074,498 43.09%
 TOTAL: 65,147,428 100.00%
The Commission, however, relied on the following
capital structure as provided by its
expert witnesses:
 Commission's Capital Structure
 Weighted
Component Proportion Rate Cost
Long Term Debt $34,568,730 44.82% 7.02% 3.15%
Preferred Stock 2,265,000 2.94 8.01 0.23
Long-Term Debt
from CTC 6,368,348 8.26 12.37 1.02
Preferred Stock
from CTC 1,846,409 2.39 9.02 0.22
Equity from CTC 21,186,664 27.47 16.00 4.39
Deferred Taxes 10,891,752 14.12 0.00 0.00
 TOTAL $77,126,903 100.00% 9.01%

Continental asserts that this substitution of capital structure is disallowed without some evidence indicating the company's capital structure was unreliable, misstated or otherwise misleading. Continental cites Continental Tel. Co. v. Alabama Pub. Serv. Com'n., 376 So.2d 1358, 1365 (Ala.1979), as controlling. In retort, the "Public Staff" argues that "[a] close examination of this case, however, indicates that the Court was addressing the Commission's use of a capital structure that existed prior to the test year, as opposed to the use of a capital structure accurately reflecting the true cost to the company during the historical test period." In view of the Commission's application of double leverage, which we discuss later, we think the following paragraphs of the Continental opinion, supra, are instructive *993 in the disposition of the capital structure issue:
"While the intervenors' expert witness, Dr. Matityahu Marcus, testified that the appropriate capital ratio for this proceeding was the capital ratio of the Company's parent corporation, Continental Telephone Corporation, his testimony was not directed at the impropriety per se of the Company's capital ratios during the test period. Dr. Marcus testified that because the Company was a wholly-owned subsidiary, the parent corporation's ability to alter the Company's capital structure indicated that the parent's capital ratio was more suitable. He did not testify that the Company's test year capital structure was contrived or deliberately misleading; he merely indicated that, in his opinion, the parent's capital structure was more appropriate.
"Despite the intervenors' earnest attempt to characterize the Company's capital figures as `hypothetical,' the APSC obviously considered the Company's figures as legitimate in the previous rate proceeding, Docket No. 17123, since it applied those figures in that case as well as the present case.
"This Court has held that it is incorrect to select a temporarily distorted capital structure as the basis for calculation in a rate proceeding. Alabama Public Service Commission v. Southern Bell T. & T. Co., 253 Ala. 1, 42 So.2d 655 (1949). It is also incorrect to arbitrarily disregard capital ratios absent some showing in the record that the ratios are temporarily distorted, deliberately misstated, or otherwise unreliable. We do not believe that there has been such a showing in this case."
376 So.2d at 1365-1366.
Plainly, the Commission's failure to employ the capital structure as provided by Continental, in the absence of any evidence challenging its accuracy, is inconsistent with the Commission's treatment of Continental's capital structure in past rate cases. And while stare decisis does not apply to decisions of administrative agencies such as the Commission, consistency is essential if arbitrariness is to be avoided. Alabama Power Co. v. Alabama Pub. Serv. Com'n., 390 So.2d 1017, 1026 (Ala.1980); State v. Alabama Public Serv. Com'n., 293 Ala. 553, 307 So.2d 521 (1975). Consequently, the Commission is to recalculate rate of return, utilizing the capital structure as submitted by Continental.

B. Double Leverage
Inextricably related to the Court's discussion of capital structure is the application of the double leverage method by the Commission in determining Continental's cost of capital. As described in the Commission order:
"Double leverage is a technique which attempts to properly reflect the fair rate of return to the ultimate stockholder for his capital investment. It clearly reflects the benefits and costs associated with a parent company which issues its own debt. Unlike some methods it provides a full return to the debt costs of the subsidiary. The testimony in the case dealt with the proper return to a shareholder owning stock in CTC. The double leverage technique gives that investor-shareholder the return found fair by the Commission and not a windfall that might be generated by a return to that investorshareholder that is based on the combined amount of debt and equity of the subsidiary."
With double leverage, the Commission found "that the cost of equity of CTC (Continental Telephone Company, Continental-Alabama's Parent Corporation) of 16% [was] just and reasonable and the structure to which it [was] applied [was] also just and reasonable." This translates to a 14.78% return for Continental in Alabama. One of the experts testifying on behalf of the "Public Staff" derived the cost of equity for CTC utilizing the Discounted Cash Flow (DFC) method. Continental's own expert calculated Continental-Alabama's rate of return on equity to be in the range of 16.55% to 21.70% based on three methods of analysis: the Security Market Plan (SMP); the risk premium analysis; and the Discounted *994 Cash Flow analysis (DCF). His recommended overall cost of capital was 12.11%.
In discussing the Commission's adoption and application of double leverage in this case, the Attorney General states in brief:
"The approach was based on the reality that the parent company invested not only its own common equity but also its own debt and preferred stock as common equity of the subsidiary. Given the reality of these various sources of funds with identifiable costs invested as equity in the subsidiary, the approach assumed an average mix of those funds. The capital structure of the Company was not adjusted, but, rather, the costs of the various components on the parent's capital structure were developed and used in estimating the cost of equity for the subsidiary. In fact, both Dr. Legler and Mr. Talbot specifically pointed out in their testimony that one advantage of the double leverage approach was that the Company's own capital structure was ultimately used in determining the overall rate of return, thus reflecting the particular risks of the Company."
The Attorney General cites cases from other jurisdictions which have addressed the propriety of assuming an average capital mix as the Commission did in this case. We quote from those utility cases cited. The Rhode Island Public Utilities Commission has stated:
"In setting rates it is generally accepted that the sources of capital supporting a utility's rate base are presumed to come equally from all the sources of capital available to the company. To do otherwise would create an unnecessarily complex allocation procedure which would be very vulnerable to manipulation by the utilities. We believe that this basic principle is equally valid in the allocation of capital costs from the parent company to the various subsidiaries in the system."
Re Blackstone Valley Electric Company, 24 Pub.Util.Rep.4th at 322 (R.I.P.U.C.1978). Likewise, the Texas Public Utilities Commission discussed the assumption in approving its hearing examiner's opinion adopting double leverage:
"First, the purpose of double leverage is to trace the true cost of a subsidiary's equity, as much as possible. Hence, the assumption that equity capital infused by a parent into the subsidiary is composed of equal parts of the parent's various components of its capital (with different costs) is made, in order to recognize that not all of the subsidiary's equity was raised at equity costs."
Re Southwestern Bell Telephone Co., 34 Pub.Util.Rep.4th at 244 (Tex.P.U.C.1980).
Continental submits that the facts of this case do not support the basic underlying assumptions inherent in the double leverage method advocated by the Commission. The Court agrees that the record, in this instance, does not support the application of double leverage. The "Public Staff" cites the Southern Bell case as implicit approval of double leverage while Continental claims the case actually reaches the opposite result. The ensuing assessment by the Court of the parent/subsidiary relationship in the Southern Bell case is instrumental in our reaching a determination on the double leverage issue in this case:
"The proof further showed as follows: Since the Bell System is financed as a whole a practical determination of the earnings requirement of the Company [i.e., Southern Bell] should be made on the basis of either the capital structure of the System as a whole or the proportionate equivalent thereof. Because the Company's capital structure is a proportionate equivalent or cross section of the System's capital structure, a realistic determination of the Company earnings requirement can be made on the basis of the Company's capital structure. Any calculation of the earnings requirement which has the effect of injecting into the Company capital structure a part of the debt capital of the American Company, when the Company is carrying its full share of the System debt, is an incorrect and illogical assumption."
253 Ala. at 18, 42 So.2d at 668-669.
Continental has not clearly shown the Court the amount of, if any, capital, *995 infused from the parent corporation into Continental-Alabama. The record indicates, without contradiction, that Continental generates its own retained earnings. Likewise, the record establishes that Continental merged with a number of operating telephone companies which had their own established and existing equity capital which became a part of Continental's equity. Thus, the Commission's utilization of double leverage lacks the evidentiary basis for its application in this case.
The Court is concerned that many of the accounting adjustments made and the methodologies applied in this case have not been used by the Commission in previous rate cases. We abide by the oft stated premise that "[i]t is not theory but the impact of the rate order which counts." Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). If, however, Continental has not been receiving the return to equity as assured by the Commission in its previous orders, there is little reason for the Court to believe that these adjustments to rate base and operating income and the application of double leverage to Continental's capital structure will produce any better results. The rate of return to equity found by the Commission is reasonable, but the Commission must recalculate rate base and operating income, consistent with the Court's findings above, and utilize Continental's capital structure in determining a fair rate of return, without applying the principle of double leverage.

VI. The Ex Parte Rule and the Commission Appearance Rule
Continental states the issue, in brief:
"Whether the commission's violations of the company's due process rights and violations of its own rules require this court to void the commission's order, with the result that the company's tariff, as filed, is effective as a matter of law."
On July 9, 1981, the Commission reorganized its staff to fully evaluate rate requests and protect due process rights of utilities. The Commission issued an order setting a target date of November 1, 1981, for the newly formed "Public Staff" to become operational.
In late November 1981, because of uncertainties as to the role of the Attorney General in future rate cases, the Commission designated a separate staff to represent consumer interests. In an effort to guarantee that the constitutional rights of all parties would be protected in the hearing process, the Commission's attorney, Mr. Euel Screws, began preparation of guidelines placing appropriate restrictions on the newly created Public Staff. On December 4, 1981, the Commission adopted a set of guidelines to make the "Public Staff" subject to all regulations governing parties before the Commission, including the ex parte rule. Attorneys for the Company were present and were allowed full participation in the discussion of the proposed rules.
On December 11, 1981, Continental objected to non-attorney members of the Public Staff questioning company witnesses during the rate hearing. The hearing examiner ruled, in accordance with procedures of other regulatory agencies, neither side would be restricted to utilizing only attorneys in the questioning of witnesses.
On February 10, 1982, over vigorous objections by the Public Staff, the Commission granted the Company's motion to require every member of the "Public Staff" and all other Commission personnel to answer a series of interrogatories designed to inform the company of any possible communication between the Public Staff and the Commission on the merits of the case. The Commission had determined earlier after reviewing the Public Staff's participation in the case that the Company was fully afforded its constitutional right to a fair and impartial hearing.
Continental alleges that during November 1981, and as late as December 3, 1981, Mr. Euel Screws, counsel for the Commission, had discussions with members of the "Public Staff" regarding the July 9, 1981, order. Other ex parte communications between the Public Staff and the Commission, which Continental claims it was not informed about, included memos from Mr. *996 Wayne Wright and Mr. Jack Hornady and the three commissioners and a memo sent by the director of engineering, who was under the operational control of the Public Staff, to all the commissioners, expressing his opinion that Continental had service problems. These communications, Continental asserts, occurred while the case was active and pending before the Commission.
This Court, for many years, has recognized that in those proceedings, such as rate cases, which are quasi judicial in nature, due process must be observed and preserved for all parties to the proceedings. Alabama Power Co. v. City of Ft. Payne, 237 Ala. 459, 464, 187 So. 632, 636 (1939). Moreover, where the Public Service Commission is involved in rate cases, we have held that "the Commission, in contemplation of law, is without interest in the controversy and sits as an impartial tribunal with statutory powers, legislative in character, to regulate the rates of public utilities." Birmingham Electric Co. v. Alabama Pub. Serv. Com'n., 254 Ala. 119, 125, 47 So.2d 449, 452 (1950). The remedy open to the Court when we have determined that proceedings before the Commission culminating in an order have abrogated the fundamental principles of due process is to void the order. Alabama Pub. Serv. Com'n. v. Redwing Carriers, Inc., 281 Ala. 111, 117, 199 So.2d 653, 658 (1967).
Continental submitted written interrogatories to more than 100 "Public Staff" and commission staff members (including secretaries and clerical aides). The Public Staff states that after an exhaustive review of all staff communications in this proceeding, Continental did not uncover any communication which affected this case or approached a discussion of the merits of Continental's rate request. The Court agrees that Continental has failed to show any prejudicial effects caused by the ex parte communications. Ferguson v. Hamrick, 388 So.2d 981, 984 (Ala.1980). Even though there is Alabama case law to support the proposition that a decision by an administrative tribunal must maintain an appearance of fairness, Board of Dental Examiners v. King, 364 So.2d 319, 321 (Ala.Civ.App. 1978), "[a]n appellate court should view with less strictness the procedural aspects of proceedings before an administrative body than when dealing with procedural aspects occurring in a lower court." Ferguson v. Hamrick, 388 So.2d 981, 984 (Ala. 1980); State v. Alabama Pub. Serv. Com'n., 293 Ala. 553, 562-563, 307 So.2d 521, 528-529 (1975).
We are sure much confusion resulted from the Commission's July 9, 1981, order establishing the Public Staff and setting forth its operations. As originally drafted, the second paragraph to part 10 reads:
"The Public Staff shall continue to advise the Commission and shall not be limited by the Ex Parte rule regarding other parties and intervenors in its relationship to the Commission, inasmuch as the Public Staff will be an extension of the Commission and will be assisting the Commission in fulfilling the duties charged by law."
Although this stated exemption of the Public Staff from the ex parte communication rule requirement, established by Rule 25[1] of the Commission's Rules of Practice, would have probably raised questions of due process, the Commission's subsequent amendment of its July 9, 1981, order abolished this exemption and established that when the Public Staff represents the consumer interest or the ratepayer in a rate case, it is subject to Rule 25.
Continental further alleges that Rule 8(a) of the Rules of Practice were violated *997 when, over company objections, seven members of the "Public Staff", plus its attorney of record, were allowed to appear and crossexamine the Company's witnesses. Rule 8(a) provides: "Parties to proceedings before the Commission shall be known as complainants, defendants, intervenors, protestants, respondents, applicants, and petitioners according to the nature of the proceeding and the relationship thereto. Any individual may appear for himself and any member of a partnership which is a party to any proceeding may appear for the partnership. A bona fide officer or full-time employee of a corporation, association, or of an individual may appear for such corporation, association, or individual. A party can be heard in person or by its or their attorney of record. Representatives of the Commission staff or persons appearing at the request of the Commission are entitled to appear in any proceeding before the Commission without having been designated as one of the above mentioned."
Continental argues that the rule is written in the disjunctive, and therefore only the party or the attorney of record is entitled to appear before the Commission. Moreover, since Rule 8(a) uses singular names, i.e., "a bona fide officer," a "fulltime employee," "a party," Continental contends that one and only one individual can appear as a party or in behalf of a party before the Commission in rate cases.
With regard to the construction of the word "or," the Court has opined:
"It is familiar law in the interpretation of statutes, constitutional amendments and other writings, that the intent of such writing is the substance, and the verbiage is mere form, and courts are at liberty in ascertaining the intent to hold that the disjunctive conjunction `or' and the conjunctive conjunction `and', sometimes carelessly used, are interchangeable, to discover the intent of the writing. Hilliard v. Binford's Heirs, 10 Ala. 977, 996;; Harris v. Parker, 41 Ala. 604, 615, 616; Porter v. State, 58 Ala. 66; Rutland v. Emanuel, 202 Ala. 269, 80 So. 107."
Opinion of the Justices, 252 Ala. 194, 198, 41 So.2d 559 (Ala.1949); State v. Steel City Crane Rental, Inc., 345 So.2d 1371, 1374 (Ala.Civ.App.1977). The hearing examiner ruled that no party to the proceeding, including Continental, would be restricted to a single attorney cross-examining witnesses. The Court, therefore, does not find this construction and application of Rule 8(a) of the Commission's Rules of Practice to be arbitrary and inconsistent with fundamental procedural fairness. See Allen M. Campbell Co. General Contractors, Inc. v. Lloyd Wood Construction Co., 446 F.2d 261, 265 (5th Cir.1971).
By addressing the issue of ex parte communications between the Commission and its "Public Staff," we should not be understood as holding that the "Public Staff" has any legal status as a party. That question was not briefed on this appeal, but we have serious questions regarding the legal status, if any, possessed by the "Public Staff," especially as a party.
We find that the rate of return to equity found by the APSC is reasonable, but we remand this case to the Commission for action on its original order consistent with special attention to the exclusions from Continental's rate base, additions to its operating income and adjustments to its capital structure.
REMANDED WITH DIRECTIONS.
All Justices concur in parts I, II, III, IV, and V.
FAULKNER, BEATTY and ADAMS, JJ., concur in part VI.
TORBERT, C.J., and JONES, ALMON, SHORES and EMBRY, JJ., concur specially in part VI.
SHORES, Justice (concurring specially).
I concur in the opinion authored by Justice Maddox but I would not address the issue of the so-called ex parte communication between the Commission and its "Public Staff." The Commission may organize its staff any way it sees fit, but by doing so may not enlarge its authority beyond that *998 delegated to it by the legislature and cannot by attaching a label to a part of its personnel clothe it with a legal identity beyond what it isthe Commission's staff.
TORBERT, C.J., and JONES, ALMON and EMBRY, JJ., concur.

ON APPLICATION FOR REHEARING
MADDOX, Justice.
The Commission, on application for rehearing, raises three main points. We extend the opinion to discuss only one of those points.
The Commission argues that it "should not be required to accept the capital structure `submitted' by Continental merely because it is `submitted'." The Commission's argument would be valid if that were the holding of this Court, but this Court has never stated that the Commission must accept any capital structure submitted by a utility to the Commission. There must be evidence to support the capital structure of the utility, and absent some evidence indicating that the Company's figures were unreliable, the Commission is not free to ignore them.
This Court discussed the applicable rule in Continental Telephone Company v. Alabama Public Service Commission, 376 So.2d 1358 (Ala.1979):
"The company presented evidence showing that as of June 30, 1977, the company's capital ratio was:

Long Term Debt 51.6%
Short Term Debt 3.1%
Preferred Stock 6.5%
Common Equity 38.80%

"* * *
"This ratio is the capital ratio submitted by the Company and used by the Commission in the Company's last rate proceeding, Docket No. 17123.

"The record does not disclose any evidence impugning the integrity of the Company's figures with respect to capitalization during the test period. As a matter of fact, the APSC appears to have relied on these capitalization figures to a certain extent. ... Absent some evidence indicating that the Company's figures are unreliable, misstated, or otherwise misleading, the Commission should not completely ignore these figures. "* * *
"Despite the intervenors' earnest attempt to characterize the Company's capital figures as `hypothetical', the APSC obviously considered the Company's figures as legitimate in the previous rate proceeding, Docket No. 17123, since it applied those figures in that case as well as the present case." [Emphasis supplied.]
The rule is that this Court mandates acceptance of a utility's capital ratios as such ratios appear on the books and records of the Company as established by competent evidence. Nothing in this Court's opinion in the instant case suggests the Commission must accept any capital structure submitted by a utility, no matter what the source and whether there is evidence supporting such capital structure, and regardless of the fact that other evidence in the record impugns the integrity of the Company's ratios. The opinion on original deliverance should not be understood to hold otherwise.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Justices concur.
NOTES
[1] "Parties or their representatives in a contested issue or proceeding which has been the subject of a formal public and open hearing shall not communicate, directly or indirectly, in connection with any issue of fact or law in that contested case, issue or proceeding with any Commissioner, Examiner, or other individual assigned to render a proposed order or final decision or to make findings of fact and conclusions of law in that contested case, issue or proceeding except upon notice and opportunity for all parties to participate and none of the Commissioners or Examiners will allow ex parte argument to be made concerning such case, issue or proceeding."