SHORES, Justice.
Union Springs Telephone Company (Union Springs or the Company) appeals from an order of the Alabama Public Service Commission (the Commission) dated May 25,1982, and running to some eighty pages, in which the Commission denied in its entirety the application by Union Springs for a $263,000 increase in its rates for telephone services. On application of Union Springs, the Court granted supersedeas in the amount of $250,000, pending disposition of the appeal.
Counsel for the Commission and for Union Springs with admirable cooperativeness agreed upon an appellate expert (authorized by Rule 33A, Alabama Rules of Appellate Procedure), the Honorable Charles A. Zielinski, whose services have clarified and simplified the issues to be decided by this Court. Both sides agree that his definitions of the issues are accurate and objective. The Court is grateful for his assistance and for that of Professor Francis McGovern, who obtained a grant from the National Science Foundation, which made it possible for the Court to have this valuable assistance.
As noted by the expert, the contested issues in this case involve Union Springs’ cost of service, that is, the costs incurred by Union Springs to provide service to its customers. A regulated utility’s cost of service consists of two basic components: a reasonable return on its property devoted to public service, its “cost of capital”; and its operating expenses, including taxes and depreciation. The property upon which the Company is permitted to earn a specific rate of return is its statutory rate base. Generally, the statute defines rate base as the reasonable value of its property devoted to the public service, calculated by its original cost, less the accrued depreciation. Ala. Code 1975, § 37-1-80. Operating expenses are calculated on the basis of a test period, which is usually the most recent twelvemonth period for which there are complete expense data, adjusted for known and measurable changes occurring outside the test year.
The expert observed correctly that since a regulated utility’s cost of service should not exceed its revenues, an increase in rates is generally required if revenues are less than costs.
The extent of the rate increase, referred to commonly as the additional revenue requirement, is usually determined by multiplying the proper total rate by an appropriate rate of return, adding the resulting figure to a suitably adjusted test year operating expense figure, and comparing the result to a suitably adjusted test year revenue figure. The extent to which the indicated costs exceed the indicated revenues constitutes the company’s additional revenue requirement and, thus, the magnitude of the rate increase.
In the order of the Commission in this case, the Commission made numerous adjustments to the rate base and test year operating results submitted by Union Springs in support of its application for a rate increase. After making these adjustments, the commission found a revenue excess and refused to allow any rate increase. On appeal, Union Springs challenges most of these adjustments, but without waiving *487 its objections to other adjustments, concedes that, if we reverse the Commission’s adjustments on four of the contested items, those four adjustments (if reversed) would be sufficient to make up the Company’s revenue deficiency and, thus, support the rate increase as sought, thereby enabling the Court to withhold consideration of other adjustments.
Two of these adjustments were to the rate base, and two were adjustments to operating results.

The Rate Base Adjustments

1. Unamortized Investment Tax Credits.
The expert’s summary of this issue, with which we agree, follows:
“Section 46 of the federal Internal Revenue Code grants taxpayers, including public utilities, a tax credit on money invested in certain property. Generally, investment tax credits may either be ‘normalized’ or ‘flowed through’ for regulatory accounting and ratemaking purposes. When credits are flowed through, the entire amount of the tax benefit is generally credited to the utility’s income statement in the year in which it is received, decreasing the company’s revenue requirement by that amount. When the credit is normalized, it is generally amortized over thé depreciable life of the investment to which the credit applies. Section 46(f) of the Internal Revenue Code prevents a regulated utility, such as Union Springs, from taking the investment tax credit if any part of the credit is used: (1) to reduce the utility’s expenses for ratemaking purposes; or (2) to reduce the utility’s rate base, unless the reduction is restored no less rapidly than ratably. [The reduction is restored rat-ably if it is restored in proportion to the depreciation of the item of plant to which it applies. Reg. § 1.46-6(g)(2). Alternatively, if the utility so elected within ninety days of the enactment of this provision in 1971, it may use the credit to reduce expenses, but not more rapidly than ratably, and then it may not use the credit to reduce rate base.]
“The regulations implementing Section 46(f) state that expenses will be deemed reduced if the credit is treated as operating income, since an increase in revenues has the same ratemaking effect as a decrease in expenses: the utility’s revenue requirement is reduced. 26 C.F.R. § 1.46-6(b)(4)(ii). In addition, rate base will be considered reduced if the credit is treated in any way other than as though it were capital supplied by common shareholders, since assigning a lower cost of capital rate to the amount of the credit is equivalent to reducing rate base. 26 C.F.R. § 1.46 — 6(b)(3)(ii). Thus, while the investment tax credit is designed to reduce a utility’s federal income taxes, it is not intended also to reduce the income on which those taxes are based.”
Union Springs carries an amount of un-amortized investment tax credit on its books. It proposed to reduce its rate base by the full amount of the unamortized credits. Additionally, it proposed that further amortization would not be credited to income. The Commission in its order rejected Union Springs’ proposal and included the amount of unamortized federal tax in the Company’s rate base and stated that the investment tax credit would be treated as operating income.
The Commission in this case conceded at oral argument that recent “rulings of the Internal Revenue Service subsequent to the Commission order ... actually show that the Commission decision in regard to investment tax credit was incorrect.” At the prehearing conference held in this ease subsequent to oral argument and after the expert’s report had been received, the attorney for the Commission again acknowledged, insofar as the investment tax credit treatment by the Commission was concerned, that this Court’s decisions in General Tel. Co. of the Southeast v. Alabama Public Service Commission, 424 So.2d 1288 (Ala.1982), and Continental Tel. Co. of the South v. Alabama Public Service Commission, 427 So.2d 981 (Ala.1982), require the Commission to observe amendments to the FCC Uniform System of Accounts, unless it *488 modifies its rules. The Commission accordingly now agrees with Union Springs that $224,290, the amount of the unamortized investment tax credits should be removed from the rate base. Therefore, that part of the Commission’s order is reversed.
2. Telephone Plant Under Construction.
Union Springs agrees with the Commission that a telephone plant under construction is properly included in its rate base, but objects to the Commission’s including in the rate base, with a corresponding increase in operating revenues, $10,977 for interest during construction (I.D.C.). Again, the Commission now concedes that the FCC Uniform System of Accounts permits the treatment of I.D.C. which the Company followed, and, therefore, the Commission erroneously adjusted this item. Under the Uniform System of Accounts (USOA), interest during construction should be computed only on items of plant requiring more than six months of construction. ¶ 31.100.2, F.C.C. U.S.O.A: The Commission concedes that Union Springs was justified in treating I.D.C. as it did in its application and that the Commission was not justified in making the adjustment to this item in its order. Therefore, the order is reversed in this regard.

Adjustments to Operating Results

1. Depreciation.
The expert summarized this issue substantially as follows:
In the past, Alabama telephone companies have been authorized to use only the straight-line whole-life method of depreciation. This was also true of telephone companies regulated by the FCC. Under this method, plant equipment was depreciated according to the average service life of a vintage group of that class of equipment.
In 1980, the FCC amended Part 31 of its USOA to permit telephone companies regulated by the FCC to use either of two alternative methods of depreciation: Equal Life Group (“ELG”) and remaining-life. The ELG methodology is a refinement of the vintage group depreciation that groups plant items by their expected life spans, rather than by broader average service life classifications. The remaining-life method is more flexible than whole-life depreciation. It permits the recovery of the cost of a plant item that is retired earlier than had been anticipated.
The FCC explained the difference between whole-life and remaining-life depreciation as follows:
“The essential difference between whole-life and remaining-life depreciation rate calculations is that the former attempts to determine that annual charge that would be appropriate in the event that the current predictions of whole-life (estimated future life added to current experienced or expired life) were in fact correct. The remaining-life process proceeds on the premise that the current prediction of remaining or prospective life is correct and attempts to allocate any unrecovered or unallocated costs over that time period. That is, the original cost less accumulated reserve, or net un-recovered cost is divided by the prospective remaining-life in order to determine the annual future charges to expense.”
Property Depreciation, 83 F.C.C.2d 289 (1982).
Both ELG and remaining-life depreciation are thought to provide better matching between capital recovery and plant retirement than whole-life depreciation. Remaining-life is especially useful in periods of rapid technological advances in which estimates of service life tend to change as equipment becomes obsolete sooner than expected.
The Company proposed depreciation rates based on remaining-life and ELG depreciation methods. The Commission rejected the Company’s proposal and insisted that depreciation expenses be determined according to the straight-line whole-life methodology then prescribed by Commission policy.
The Company argues that remaining-life depreciation is authorized by the 1980 amendments to the FCC’s USOA. In Continental Tel. Co. of the South v. Ala *489 bama Public Service Commission, supra, the Court held that the Commission’s 1968 adoption of the USOA included subsequent amendments, 427 So.2d at 986. With respect to remaining-life depreciation, we said:
“It is agreed by all parties that the whole life method of depreciation is currently applied to all utilities operating in Alabama. We refuse to mandate that the Commission utilize the particular accounting method suggested by Continental rather than the one presently used.”
427 So.2d at 991.
The Continental opinion was released on December 22, 1982. Coincidentally, on that exact date the FCC adopted its opinion and order in Docket No. 79-105, which was released on January 6, 1983. By that order the FCC overruled its prior decision in Amendment of Part 81, Uniform System of Accounts, 89 F.C.C.2d 1094 (1982), in which it held that §§ 220(a) and 220(b) of the Communications Act of 1934, as amended, 47 U.S.C. 220(a) and 220(b), did not preempt state commissions from applying different accounting and depreciation procedures for purposes of intrastate ratemaking proceedings. In its December 22, 1982, order, the FCC stated:
“Thus, we find it imperative to declare today that inconsistent state prescribed depreciation rates are preempted by the Communications Act and are accordingly void. The existence of a state statute preventing a state commission from adopting a particular method does not affect this determination. When federal preemption is involved, there is no difference between a statute and a regulation of a state commission. Both must fall in the face of overriding federal concerns and policies.”
The Commission now concedes that under the decisions of this Court in General Tel. Co. of the Southeast v. Alabama Public Service Commission, supra, and Continental Tel. Co. of the South v. Alabama Public Service Commission, supra, it must follow amendments to the USOA adopted by the FCC. It contends, however, that the FCC order entered December 22,1982, just quoted from, does not apply to intrastate telephone companies such as Union Springs, but applies only to interstate companies such as AT & T. We cannot agree with this construction of the order. It seems to us to be much broader and, although it was entered in a case involving interstate companies, it does not rest upon that narrow ground. This seems clear from the separate statement of Commissioner Fogarty, who said:
“Having dissented from the Commission’s original decision declining to preempt State accounting and depreciation rules inconsistent with those prescribed by the FCC [Amendment of Part 31, Joint Dissenting Statement of Commissioners Joseph R. Fogarty and Anne P. Jones, 89 F.C.C.2d 1109-1111 (1981)], I am pleased that the Commission has reconsidered this issue and acted to preempt such inconsistent State regulation.
“As this Order establishes in detail, a true reading of the statutory language and legislative history of Section 220(b) of the Communications Act clearly demonstrates that Congress intended FCC depreciation rules and policies to control the field.
“Even if preemption were not explicitly mandated by Section 220(b), the effective implementation of our proeompeti-tive federal telecommunications policies dictates that inconsistent State depreciation regulation be preempted by this Commission. We cannot ‘defer to the States’ on capital recovery issues. Telephone companies must be able to recover their cost of capital in a timely and effective manner if they are to price their services efficiently and to improve and expand their facilities to meet the challenges of competition and technologic innovation.
“This preemption imperative is not merely theoretical. Too many States (e.g., Alabama, Louisiana, Nebraska, Ohio, New Jersey, Michigan, Arkansas) have already refused to recognize the critical necessity of the FCC’s cost recov *490 ery principles. The resulting depreciation rate differentials are alarming: GTE of Ohio has indicated that it will be denied $7 million in capital recovery this year if the State of Ohio’s disparate depreciation treatment is allowed to prevail.
“The FCC cannot ignore the detrimental impacts of inconsistent State treatment of depreciation if our procompeti-tive policies are to have any integrity and viability. This Commission now recognizes that preemption is both mandated as a matter of law and essential as a matter of policy, and our action today has my full endorsement and support.”
We now hold, as we declined to do in Continental, that the Commission must allow remaining-life depreciation and, of course, note that it does so by its order entered on November 12, 1982. Even so, the Commission argues that its order disallowing the remaining-life methodology by Union Springs in this case should not be reversed, because Union Springs did not support its use of that method by the evidence. It argues that Union Springs presented insufficient data to justify its requested depreciation rates. The Company presented two expert witnesses, both of whom testified that the use of the whole-life method of depreciation had resulted in under depreciation and that the adoption of the remaining-life method would be more equitable in that it more closely approaches the realities of the remaining useful life of an item. The Commission did not offer any evidence to the contrary, and we think it would be unreasonable to require the Company to comply with the criteria set out in the generic order, which the Commission contends simply tracks the FCC criteria for obtaining approval for use of remaining-life method, when that order was not in existence at the time the Company sought approval of this method of depreciation.
The Commission’s counsel inquired of the appellate expert at the prehearing conference “whether allowing Union Springs to use the remaining-life depreciation in this case wouldn’t mean that future customers would have to pay for the deficiency that was created in previous years.” The expert responded that as a matter of “intergenera-tional equity,” any time there is a change in depreciation, that sort of thing can happen, but that is the result of failure to accurately predict the future. We do not think this is a sufficient reason for disallowing remaining-life depreciation methodology. The law does not require perfect prescience in this area any more than it does in other areas. It is conceded by all parties that remaining-life depreciation is a commonly accepted method, recognized in the business community generally. The FCC has now determined that it is an acceptable method for telephone companies. Union Springs offered reasonable evidence to support its use in this case, and that evidence was not disputed. Therefore, we hold that the Commission erred in disallowing remaining-life depreciation.
2. Expensing of Station Connections.
Again, the appellate expert’s summary of the position of the parties is accepted as accurate by both sides. It follows:
In the terminology of the telephone industry, a “station connection” generally consists of the material and installation cost of connecting a customer’s telephone instruments to the telephone transmission network. Under the USOA prior to 1981, the costs of station connections were capitalized and, therefore, recovered over a period of time and from the entire customer body. Ratemaking generally followed this accounting treatment and kept the charges for connecting a new customer to the network lower than they would have been if each new customer had to pay the full cost of connection at the time of connection.
In 1980, the FCC amended Part 31 of the USOA to require all telephone companies subject to its jurisdiction to account for the portion of station connection costs incurred to install inside wiring as expenses. First Report and Order in CC Docket No. 79-105, 85 F.C.Cüd 818 (1980). For ratemaking purposes, of course, expenses are recoverable immediately from the customer. Under the FCC amendment to the USOA, tele *491 phone companies could implement the change immediately (a “flash-cut” basis) or phase it in over four years.
Union Springs sought to change the accounting treatment of its station connections, in accordance with the FCC’s change in the USOA, on a flash-cut basis.
Again, the Commission rejected the proposal, stating that it was not required to follow the FCC amendments to the USOA. It now concedes that it must, as the Court held in Continental Tel. Co. of the South v. Alabama Public Service Commission, supra, where the Court, speaking through Justice Maddox, said: “[T]he Commission should have allowed expensing of station connections consistent with the recent amendment of the USOA.” 427 So.2d at 991.
By its order of November 12, 1982, the Commission has authorized Alabama telephone companies to file tariffs reflecting the accounting for station connection costs related to inside wiring and the installation of telephone sets as expenses. We hold that the Commission erred in disallowing the expensing of station connections as proposed by the Company and reverse its order in that regard.
In summary, we reverse the order of the Commission on the following four adjustments: remaining-life depreciation, interest during construction, investment tax credit, and expensing of station connections. We remand this case to the Commission for its action on its original order to conform to this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, EMBRY, BEATTY and ADAMS, JJ., concur.